John **SHARP,** Comptroller of Public Accounts for the State of Texas; Dan Morales, Attorney General of the State of Texas; and Martha Whitehead, successor to Kay Bailey Hutchison, Treasurer of the State of Texas, Appellants,

v.

**DIRECT RESOURCES FOR PRINT, INC. (formerly ATC Communications, Inc.), Appellee.**

No. 03–94–00599–CV.

Court of Appeals of Texas, Austin.

Aug. 16, 1995.

Rehearing Overruled Sept. 20, 1995.

Released for Publication Oct. 18, 1995.

---

Jim B. Cloudt, Assistant Attorney General, Taxation Division, Austin, for Dan Morales, Attorney General.

Darold Maxwell, Maxwell & Walker, L.L.P., Houston, Stanley R. Kaminski, McDermott, Will & Emery, Chicago, IL, for appellee.

Before CARROLL, C.J., and ABOUSSIE and JONES, JJ.

ABOUSSIE, Justice.

This case presents the question whether a direct mail service must pay sales tax on the portion of its service relating to the ink-jet addressing of envelopes. Direct Resources for Print, Inc. ("Direct Resources") brought suit to recover Texas sales tax paid under protest and to obtain a declaration that its mailing services are not taxable under Texas law. Appellants John Sharp, as Comptroller of Public Accounts for the State of Texas; Dan Morales, as Attorney General of the State of Texas; and Martha Whitehead, Treasurer of the State of Texas (collectively, the "Comptroller") appeal from that portion of the trial court's judgment granting in part Direct Resources's motion for summary judgment and ordering them to refund the sales tax Direct Resources paid under protest. Direct Resources cross-appeals from that portion of the trial court's judgment granting in part the Comptroller's motion for summary judgment and denying Direct Resources's claim for attorney's fees. We will affirm the trial court's judgment.

## BACKGROUND

Direct Resources is a Texas corporation engaged in the business of providing direct mail services. These services include the organizing, folding, collating, inserting in envelopes, and mailing of preprinted advertising circulars, brochures, pamphlets, and other materials. Direct Resources addresses the envelopes to those on the mailing list by means of a machine that attaches the address labels to the envelopes or by means of an ink-jet addressing machine that prints the information directly on the envelopes.

During the years at issue in this cause, a representative direct-mail job by Direct Resources involved the following steps:

(1) Clients furnished Direct Resources with the advertising material to be mailed, envelopes, an address list, and any special mailing instructions.

(2) Direct Resources then organized, folded, and inserted into envelopes the material to be mailed.

(3) Direct Resources sent the address list to a second entity, Houston Data Services, which either transferred the list onto address labels or into a machine-readable format for an ink-jet machine.

(4) Direct Resources then had either a labeling machine cut the address labels apart and glue them to envelopes or an ink-jet machine print the addresses on envelopes.

(5) After the envelopes were addressed, Direct Resources sealed, sorted, metered, bagged, and delivered the envelopes to the post office.

The Comptroller audited Direct Resources for sales tax compliance for the period of October 1, 1986, through October 31, 1990, and determined it owed $39,188.60 in additional sales tax, penalties, and interest. The Comptroller ruled that the addressing of envelopes by means of an ink-jet machine for consideration is a taxable printing service under section 151.005(4) of the Tax Code [1] and assessed taxes relating to that portion of Direct Resources's services during the period in issue.

Direct Resources paid the assessed tax under protest pursuant to section 112.051 of the Tax Code. *See* Tex.Tax Code Ann. § 112.051 (West 1992). Direct Resources then filed this action, requesting a tax refund, a declaration under 42 U.S.C. § 1983 and section 112.051 of the Tax Code that its direct mail service was not subject to Texas

---

1. A tax is imposed on each sale of a taxable item in the State of Texas. Tex.Tax Code Ann. § 151.051 (West 1992). When done or performed for consideration, printing is a sale subject to sales tax. *Id.* § 151.005(4). Section 151.005(4) provides:

   "Sale" or "purchase" means any of the following when done or performed for consideration:
   . . .

   (4) the production, fabrication, processing, *printing, or imprinting of tangible personal property for consumers* who directly or indirectly furnish the materials used in the production, fabrication, processing, printing, or imprinting; . . . .

   *Id.* (emphasis added).

sales tax, and attorney's fees as authorized under 42 U.S.C. § 1988. After a hearing on cross-motions for summary judgment, the trial court rendered judgment declaring that Direct Resources's business is not a taxable service or sale under the Tax Code's sales tax provisions and ordered the sales taxes refunded to Direct Resources. The trial court denied Direct Resources's request for attorney's fees. By two points of error, the Comptroller appeals the trial court's judgment granting Direct Resources a tax refund and denying its own motion for summary judgment.[2] By two cross-points of error, Direct Resources appeals that portion of the trial court's judgment denying its recovery of attorney's fees.

## DISCUSSION

The Comptroller maintains that Direct Resources is liable for sales tax because it engaged in printing or imprinting for consideration, see Tex.Tax Code Ann. § 151.005(4) (West 1992), and in word processing, see id. § 151.0101(a)(12) (West 1992), when it sprayed addresses in ink onto envelopes and charged its customers for the ink-jet addressing. Direct Resources responds that it should not be liable for the sales tax paid under protest because the essence of its transaction with its customers was a nontaxable direct-mail service rather than the printing of envelopes for consideration.

The parties agree that the term "printing" has no commonly understood or generally accepted definition. Because we base our opinion on the essence-of-the-transaction doctrine, even if the process used to address envelopes with an ink-jet machine can be characterized as a printing, imprinting, or word processing activity, that characteriza-

tion does not control the outcome of this cause.

The established test for determining whether a transaction is subject to sales tax involves the determination of the ultimate object or the essence of the transaction. *Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 167 (Tex.1977); *Williams & Lee Scouting Serv., Inc. v. Calvert*, 452 S.W.2d 789, 792 (Tex.Civ.App.—Austin 1970, writ ref'd); *Comptroller of Public Accounts v. Austin Multiple Listing Serv., Inc.*, 723 S.W.2d 163, 165 (Tex.App.—Austin 1986, no writ); *First Nat'l Bank v. Bullock*, 584 S.W.2d 548, 550 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). The inquiry concerns what is being sold. *Williams & Lee*, 452 S.W.2d at 792. In other words, the essence of the transaction is the customer's basic purpose in entering into the transaction. *Statistical Tabulating*, 549 S.W.2d at 169. In determining the object of the transaction, many factors are relevant, and the issue must be determined on a case-by-case basis. *Id.* If the essence of the sale is not tangible personal property but instead concerns intangible property such as a service, the transaction is not taxable under any definition of sale. *Id.* at 168. Any ambiguities in the application of the essence of the transaction test must be resolved in the taxpayer's favor; taxing statutes must be construed strictly against the taxing authority and liberally in favor of the entity sought to be taxed. *Id.* at 169; *Williams & Lee*, 452 S.W.2d at 793.

In the instant cause, we must determine whether the essence of the assessed transactions was a taxable transfer of printing for consideration or the nontaxable performance of a direct-mail service.[3] We con-

---

**2.** We note that the trial court granted the Comptroller's motion for summary judgment to the extent that it denied Direct Resources's claim for attorney's fees.

**3.** The Comptroller initially contends that the essence-of-the-transaction doctrine is inapplicable to this cause in which a taxable sale—printing for consideration—is bundled with nontaxable services—other mailing tasks performed by Direct Resources. As authority, the Comptroller cites Tax Code § 151.052(c): "When several taxable items are sold together and at the same time, the sales tax is determined on the sum of

the sales prices of the items sold exclusive of any item the sale of which is exempted by this chapter." Tex.Tax Code Ann. § 151.052(c) (West 1992). We conclude that the Comptroller's argument does not preclude application of the essence-of-the-transaction doctrine because the assessed transactions in this cause do not involve the sales of multiple items, some of which are clearly taxable and others of which are clearly exempted from sales tax. Rather, the parties dispute whether a component part of Direct Resources's mail service, that of addressing envelopes with an ink-jet machine, even constitutes a

clude that the essence of Direct Resources's transactions with its customers during the years at issue was the performance of a direct-mail service; the true object sought by Direct Resources's customers was not a finished product in the form of envelopes addressed by an ink-jet machine but the receipt of a direct-mail service. Customers, in handing over an address list, advertising circulars, and mailing instructions to Direct Resources, desired something beyond the tangible printed envelopes; they sought the mailing of those envelopes and the enclosed advertising material to the targeted recipients.

The Comptroller contends, nevertheless, that the assessed transactions are taxable as printing for consideration, identifying several factors it believes establish that the essence of the assessed transactions in this cause was not a mailing service. We conclude however, that the factors the Comptroller identifies support our conclusion that the essence of the assessed transactions was a mailing service.

One factor identified by the Comptroller is the availability of other nontaxable forms in which to carry out the transaction. *See Statistical Tabulating,* 549 S.W.2d at 168. In *Statistical Tabulating,* the taxpayer processed raw data obtained from customers by translating it into a computer code that was punched onto key punch cards ultimately given to the customers. *Id.* at 167–68. The customers, in turn, used the punch cards to transfer the coded data into their own computers. *Id.* The court noted that the coded data was transferred by means of punch cards but could have been transferred to the customers' computers through several other forms, such as tapes and telephones. *Id.* at 168; *see also Williams & Lee,* 452 S.W.2d at 792 (recognizing printed reports could take other forms such as handwritten notes and telephone or telegraph communications); *Austin Multiple Listing,.* 723 S.W.2d at 166 (noting information contained in printed books could have been transferred in variety

of forms). This factor led to the court's decision that the essence of the customers' transactions was not the receipt of taxable tangible personal property in the form of coded punch cards, but the receipt of a data processing service. *Statistical Tabulating,* 549 S.W.2d at 168. Thus, the transaction was not one intended to be taxed under sales tax provisions. *Id.* at 169.

In the instant cause, the addressing component of Direct Resources's mailing service can be accomplished not only by ink-jet printing but also by the application of mailing labels or even handwriting or typing.[4] As in *Statistical Tabulating,* the availability in the instant cause of tax-free forms to carry out the transaction in addition to the allegedly taxable form actually used indicates that the essence of the customers' transactions was not the printing of envelopes but the mailing of advertising materials.

Another factor identified by the Comptroller is the length of the useful life of the printed item. *See Austin Multiple Listing,* 723 S.W.2d at 165. In *Austin Multiple Listing,* every week the taxpayer purchased a book containing compiled and processed raw data supplied by the taxpayer regarding properties on the real estate market. *Id.* at 164. The court concluded that regardless of its format, the processed real estate data had a very short useful life because of the everchanging nature of the real estate business. *Id.* at 165. This factor led the court to conclude that the essence of the transaction was the rapid data-processing service provided rather than the printed book itself. *Id.* at 165–66; *see also Williams & Lee,* 452 S.W.2d at 792 (discussing value of timely compiled data in printed reports provided by oil and gas scouting service); *Geomap Co. v. Bullock,* 691 S.W.2d 98, 101 (Tex.App.—Austin 1985, writ ref'd n.r.e.) (emphasizing that printed maps provided were updated monthly by geological data interpretation service); *cf. Statistical Tabulating,* 549 S.W.2d at 167

taxable sale of printing for consideration. The essence-of-the-transaction test specifically applies to those sales tax cases in which it is initially unclear whether a transaction mixes sales and services. *See Austin Multiple Listing,* 723 S.W.2d at 165.

4. Even though a customer, rather than Direct Resources, may, at times, select the use of the ink-jet machine to address envelopes, the customer's true object of the transaction, the mailing of its advertising materials, does not change, as evidenced by other reasons discussed *infra.*

(noting that once data on computer punch cards was retained in customer's computer memory, cards had no further use); *First Nat'l Bank*, 584 S.W.2d at 550 (concluding essence of transaction was sale of information rather than magnetic computer tapes because once information was transferred to appellant's computer, magnetic tape which originally held the information lost its value or importance to appellant).

In the instant cause, the addressing component of Direct Resources's mailing process enables the customers' advertising circulars, once mailed, to arrive at their proper destinations. The short useful life of the addressed envelopes, like that of the printed books in *Austin Multiple Listing*, indicates that Direct Resources's customers desired something beyond printing. The printed object is the means used to facilitate the customer's goal—in this cause, quick and efficient mail distribution.

The Comptroller has identified other factors that do not apply to the facts of this case. *See Williams & Lee*, 452 S.W.2d at 792 (concluding essence of transaction was information gathering service partly because printed geological reports cost $1,800 per month while additional copies cost only $3 to $5); *Geomap*, 691 S.W.2d at 101 (concluding essence of transaction was information partly because all printed maps had to be returned upon contract termination). The out-of-state cases the Comptroller cites discuss factors similar to those identified in Texas case law which we have addressed. *See Culligan Water Conditioning of Bellflower, Inc. v. State Bd. of Equalization*, 17 Cal.3d 86, 130 Cal. Rptr. 321, 550 P.2d 593, 599 (1976); *Sneary v. Director of Revenue*, 865 S.W.2d 342, 346 (Mo.1993); *Federated Dep't Stores, Inc. v. Lindley*, 8 Ohio St.3d 35, 456 N.E.2d 1209 (1983).

Citing *Consolidated Freightways Corp. v. State*, 112 Idaho 652, 735 P.2d 963, 966 (1987), the Comptroller additionally argues that a business's assessment of a separate charge for printed material is clear evidence that the printed material constitutes the essence of the transaction. In *Consolidated Freightways*, the producer of printed schedules sent bills itemizing the costs of producing the schedules as well as the services required to create the schedules and other services that were distinct and separate from schedule production. 735 P.2d at 964–65. The customer then paid the bills, separating the cost of the printed schedules by charging it to a different expense account than that to which the cost of the unrelated services was charged. *Id.* at 964–65. In determining whether to impose a use tax on the customer for its acquisition of the printed schedules, the court used an essence-of-the-transaction test, employing wording from an Ohio sales tax statute to hold that a separate charge for the schedules was clear evidence that they were not incidental to any services but were the true object of the transaction. *Id.* at 966–67. Thus, the critical factor in determining the essence of the transaction was not the producer's itemization of costs but the customer's own accounting system, which charged different expense accounts for different aspects of the itemized bill.

The Comptroller contends that Direct Resources charges separately according to the type of addressing utilized, citing as evidence its auditor's worksheet, which lists the taxable amount attributable to the addressing of envelopes by ink-jet application. The record contains no invoices, but a Comptroller's decision in the record suggests that Direct Resources included separate items in its customers' invoices. *See* Tex.Comp.Pub.Acc'ts, Hearing No. 28,170 (Aug. 20, 1992). We conclude that even if Direct Resources itemizes its charges for ink-jet addressing on its customer's invoices, that itemization does not prove that one of those itemized charges establishes the essence of the transaction.

Mailing cannot be completed without addressing envelopes, but it also cannot take place without completion of other tasks by Direct Resources. In addition to addressing envelopes, Direct Resources organizes, folds, and inserts into envelopes the materials to be mailed, and sorts and bags the envelopes to be mailed. Performance of the addressing component by an ink-jet machine does not transform the essence of the transaction into printing for consideration. The customer's desired finished product is not addressed envelopes but the receipt of advertising ma-

terials by addressees. We conclude that printing for consideration as contemplated by section 151.005(4) of the Tax Code does not apply to a printing component of a transaction, the essence of which is a mailing service.

By two cross-points of error, Direct Resources argues that (1) the Comptroller's arbitrary and unequal application of Texas sales tax provisions to its mail service violated its constitutional equal protection rights subjecting the Comptroller to an action for declaratory judgment under 42 U.S.C. § 1983 and (2) the trial court thus erred in failing to award Direct Resources its reasonable costs and attorney's fees under 42 U.S.C. § 1988.[5] However, even assuming that the Comptroller violated Direct Resources's constitutional equal protection rights, Direct Resources could not bring an action for declaratory relief against the Comptroller pursuant to § 1983.[6] The Supreme Court has recently held: "When a litigant seeks declaratory or injunctive relief

against a state tax pursuant to § 1983, ... state courts ... must refrain from granting federal relief under § 1983 when there is an adequate legal remedy [under state law]." *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, — U.S. —, —, 115 S.Ct. 2351, 2357, 132 L.Ed.2d 509 (U.S. June 19, 1995). In *National Private Truck Council*, the Court concluded that Oklahoma courts could not award either declaratory or injunctive relief against state taxes under § 1983 because it was undisputed that the petitioners already had an adequate legal remedy in the form of a tax refund awarded under state law. *Id.* at —–—, 115 S.Ct. at 2355–56.

In the instant cause, the trial court awarded to Direct Resources a refund of taxes paid under protest, declaring that for the years in question, Direct Resources's business is not a taxable service or sale under the Tax Code's sales tax provisions. Direct Resources does not complain that it has not received an adequate remedy under state law. We thus hold that Direct Resources has received an adequate remedy under state law and that neither the trial court nor this Court can grant the declaratory relief Direct Resources requested pursuant to § 1983. *See id.* at —, 115 S.Ct. at 2356–57. "It follows that when no relief can be awarded pursuant to § 1983, no attorney's fees can be awarded under § 1988." *Id.* We overrule both of Direct Resources's cross-points.

### CONCLUSION

Having overruled the Comptroller's points of error and Direct Resources's cross-points of error, we affirm the judgment of the trial court.

---

**5.** Section 1988(b) provides: "In any action or proceeding to enforce a provision of section[ ] ... 1983 ... of this title ..., the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b) (Supp. V 1993).

**6.** Section 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any

State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
42 U.S.C. § 1983 (1988).