# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00449-CV

**Chevron Pipeline Company and West Texas Gulf Pipeline Company, Appellants**

**v.**

**Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. GN304712, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

Chevron Pipeline Company and West Texas Gulf Pipeline Company[1] appeal the district court's judgment affirming the Comptroller's[2] determination of tax liability for excavation and backfilling services and the remedial installation of cathodic protection[3] devices. Chevron argues that its purchase of these services was non-taxable. In two issues, Chevron challenges the legal sufficiency of the evidence, contending that (1) excavation and backfilling services are non-

---

[1] Because the interests of Chevron Pipeline Company and West Texas Gulf Pipeline converge, we refer to appellants collectively as "Chevron" unless otherwise noted.

[2] Because the interests of the Comptroller of Public Accounts and the Attorney General converge, we refer to the appellees collectively as the "Comptroller."

[3] Cathodic protection is a process used to halt or reduce the corrosion of steel pipelines.

taxable "unrelated services" under Comptroller Rule 3.357, *see* 34 Tex. Admin. Code § 3.357 (2005), and (2) the remedial installation of cathodic protection devices was non-taxable "new construction," and not taxable "real property repair and remodeling." *See* Tex. Tax. Code Ann. § 151.0101(a)(13) (West 2002). We reject these contentions and affirm the district court's judgment.

## FACTS AND PROCEDURAL BACKGROUND

The material facts are undisputed. The Comptroller assessed taxes against Chevron Pipeline Company during an audit period from July 1, 1991, to September 30, 1997, and against West Texas Pipeline Company for the audit period of January 1, 1992, to December 30, 1997. Chevron sought a redetermination of these tax assessments and a refund from the Comptroller. *See id*. §§ 111.009, .104 (West 2001). After the Comptroller denied the requests, Chevron paid the deficiency under protest and filed suit in district court seeking a refund. *See id*. §§ 112.051, .052, .151 (West 2001).

The district court conducted a trial *de novo* on Chevron's claims. *See id*. § 112.054. The record reflects that Chevron owns and operates various pipelines throughout Texas. Chevron presented two witnesses at trial—pipeline integrity technologists Mark Hildebrand and Mark Stephen Caskey. Hildebrand testified on the issue of excavation and backfilling services.[4] Hildebrand explained that Chevron runs internal inspection devices through its pipelines, and he analyzes the collected data to make necessary repairs and other recommendations. Hildebrand

---

[4] In addition to Hildebrand's testimony, Chevron introduced into evidence copies of all of the invoices for the excavation and backfilling services at issue.

2

testified that one type of repair involves "recoating" the pipeline.[5] Once Chevron determined that it was necessary to recoat a pipeline, Hildebrand explained that the pipeline would be marked and excavated; the old coating would be removed, and a new coating would be applied; then the pipeline would be re-covered, or backfilled. Hildebrand testified that there were different crews with different duties throughout the process. For example, one crew would excavate; another would strip the old coating; still another would apply the new coating; and yet another crew would backfill, or cover up, the pipeline.

On cross-examination, Hildebrand testified that all of the pipelines in this case were underground and that Chevron could not recoat its underground pipelines without excavation. According to Hildebrand, all of the excavation services at issue were performed in conjunction with additional repair work. Hildebrand also stated there were no instances before the trial court in which Chevron had contracted for excavation or backfilling services apart from other repairs.

On the issue of cathodic protection, Chevron presented the testimony of Mark Stephen Caskey.[6] Caskey explained that cathodic protection is a method of protecting the pipelines by installing an anode, which serves as the object of corrosion instead of the pipeline. Caskey explained the different methods of cathodic protection that Chevron used and testified that the anodes are typically installed in separate beds away from the pipeline, a cable is run from the anode bed to a rectifier, and then from the rectifier to the pipeline. Caskey testified that the pipelines at

[5] Hildebrand testified, "The term 'recoating' is a blanket term we use in the pipeline industry." It can mean repainting for above-ground pipelines, or it can mean rewrapping, or putting on an epoxy coating or other sleeving for underground pipelines.

[6] In addition to Caskey's testimony, Chevron also introduced into evidence pictures of the various types of cathodic protection installations at issue.

issue all had existing cathodic protection devices and that Chevron had determined "through one means or another" that additional installations of cathodic protection devices were needed. Caskey explained that the existing cathodic protection devices were left in place and that new holes or trenches were dug to install additional cathodic protection devices.

When asked on cross-examination how and where Chevron determined to install additional cathodic protection devices, Caskey testified that the existing ground beds of anodes would deplete over time and their useful life would come to an end. According to Caskey, Chevron used the rectifiers to monitor the condition and effectiveness of the existing ground beds at two-month intervals, and once the anodes reached the end of their useful life, Chevron would install a new ground bed at that location.

At the conclusion of trial, the court granted judgment in favor of the Comptroller. Chevron requested findings of fact and conclusions of law, which the trial court entered on June 16, 2005. Specifically, the trial court found:

4. Chevron and West Texas assert that they are entitled to a refund of sales taxes wrongly assessed by the Comptroller and paid by Chevron and West Texas on their purchases of installations of cathodic protection devices and on their purchases of excavation and backfilling services. The installations of cathodic protection devices and the excavation and backfilling services were purchased by Chevron and West Texas from third-party contractors.

5. The parties have agreed to the amounts in issue with respect to the two matters in dispute as follows:

   a. Cathodic protection - $184,678.48

   b. Excavation and backfilling - $89,837.23

4

6. Chevron and West Texas do not contest the validity or application of Comptroller Rule 34 Tex. Admin. Code. § 3.357.

7. Chevron and West Texas owe the sales taxes as assessed by the Comptroller.

With respect to the issue of cathodic protection installations, the trial court entered additional findings of fact as follows:

8. The cathodic protection installations in issue are the repair, restoration, remodeling or modification of an improvement to real property that is not used as a residence or immediately adjacent to a residence and part of a residence.

9. The cathodic protection installations made over, rebuilt, replaced or upgraded existing non-residential real property. The cathodic protection installations brought back as near as can be to its original working order non-residential real property that was broken, damaged or defective.

10. The cathodic protection installations brought back as near as could be to its original condition real property which was still operating and functional, but was faded, declined or deteriorated.

* * *

13. The cathodic protection installations did not add new, useable square footage to an existing structure.

With regard to excavation and backfilling services, the trial court found:

14. The excavation and backfilling in issue is not an unrelated service.

15. The excavation and backfilling in issue was required to perform the repairs and recoating of the pipelines owned by Chevron and West Texas.

16. The repair and recoating performed in conjunction with the excavation and backfilling is taxable.

5

17. The performance of the excavation and backfilling is not distinct and identifiable from the taxable pipeline repairs.

Based on these findings, the trial court concluded that the cathodic protection installations and excavation and backfilling services in issue were subject to sales tax and that Chevron and West Texas were not entitled to a refund. This appeal followed.

## STANDARD OF REVIEW

Although the Comptroller conducted a hearing and issued a decision on Chevron's request for redetermination, judicial review in a tax refund suit brought by the taxpayer is *de novo*. Tex. Tax Code Ann. §§ 112.054, .154 (West 2001). The Administrative Procedure Act (APA) provides that when "the manner of review authorized by law for the decision in a contested case that is the subject of complaint is by trial de novo, the reviewing court shall try each issue of fact and law in the manner that applies to other civil suits in this state as though there had not been an intervening agency action or decision." Tex. Gov't Code Ann. § 2001.173 (West 2000).

After a *de novo* trial, the trial court granted judgment in favor of the Comptroller on all issues. The trial court supported its judgment with findings of fact and conclusions of law. In a bench trial, the court's findings of fact have the same force and effect as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *GATX Terminals Corp. v. Rylander*, 78 S.W.3d 630, 633 (Tex. App.—Austin 2002, no pet.). Likewise, appellate courts review the factual and legal sufficiency of the trial court's findings of fact and conclusions of law according to the same standards as jury findings. *Catalina*, 881 S.W.2d at 297.

6

On appeal, Chevron challenges the legal sufficiency of the trial court's conclusions that Chevron is liable for the tax imposed on its purchases of excavation and backfilling services and the remedial installation of cathodic protection devices. Our consideration of Chevron's challenge is guided by the supreme court's decision in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). In reviewing the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See id*. at 807. The test for legal sufficiency is whether the evidence would enable reasonable people to reach the judgment being reviewed. *Id*. at 827-28.

**DISCUSSION**

Chevron brings two issues on appeal. First, Chevron contends that the remedial installation of cathodic protection devices is non-taxable new construction, and not taxable repair or remodeling. Second, Chevron contends that the excavation and backfilling services purchased in conjunction with other repair services are non-taxable "unrelated services" within the meaning of Comptroller Rule 3.357. *See* 34 Tex. Admin. Code § 3.357. The Comptroller responds that it has consistently held that remedial installations of cathodic protection devices are not new construction, but instead constitute taxable repair or remodeling. The Comptroller further responds that excavation and backfilling services purchased in conjunction with other pipeline repair work cannot be "unrelated services" within the meaning of Rule 3.357. Under the standard of review for legal sufficiency, Chevron must demonstrate that no reasonable fact-finder could have concluded that it

7

was not liable for the tax on the remedial installations of cathodic protection devices or its purchases of excavation and backfilling services.

### Remedial Installations of Cathodic Protection Devices

The tax code defines "real property repair and remodeling" as the repair, restoration, remodeling, or modification of an improvement to real property. Tex. Tax Code Ann. § 151.0047 (West 2002). The legislature has imposed a tax on real property repair and remodeling services in section 151.0101(a)(13) of the tax code. Tex. Tax Code Ann. § 151.0101(a)(13) (West 2002). The Comptroller has exclusive jurisdiction to determine whether services fall into this category. *Id*. § 151.0101(b). In exercise of this jurisdiction, the Comptroller has adopted Rule 3.357. *See* 34 Tex. Admin. Code § 3.357 (2005).[7] Chevron does not challenge the validity or applicability of Rule 3.357.

Rule 3.357 includes the following definitions of new construction and remodeling, repair, and restoration:

> (8) New construction—All new improvements to real property including initial finish out work to the interior or exterior of the improvement. An example is a multiple story building that has had only its first floor finished and occupied. The initial finish out of each additional floor before initial occupancy or use is considered new construction. New construction also includes the addition of new, usable square footage to an existing structure. Examples are the addition of a new wing onto an existing building, or the addition of a new mezzanine level within an existing building. Reallocation of existing square footage inside a structure is remodeling and does not constitute the addition of new,

---

[7] For convenience, we cite to the current version of Rule 3.357. Although Rule 3.357 has been amended during the pendency of this litigation, the parties agree that the amendments do not alter the substance of the rule or its application to the facts of this case.

8

usable square footage. For example, the removal or relocation of interior walls to expand the size of a room, or the finish out of an office space that was previously used for storage, is remodeling. Raising the ceiling of a room or the roof of a building is not new construction unless new, usable square footage is created.

\* \* \*

(11) Remodeling or modification—To *rebuild, replace, alter, modify, or upgrade existing real property*. However, the replacement of an item that is within an operational and functional improvement to realty is not taxable remodeling or modification when the work is scheduled and periodic maintenance as defined in paragraph (7) of this subsection. . . . Work that is performed after the initial finish out has been completed is remodeling even when the improvement has not been occupied or used. For example, a prospective tenant wants the unit of a completely finished out shopping complex repainted before the tenant leases the unit. The repainting is remodeling. Partial demolition of existing nonresidential realty is taxable remodeling. The complete demolition of an existing nonresidential improvement to real property is neither remodeling nor modification and is not taxable.

(12) Repair—To mend or bring back real property that was broken, damaged, or defective as near as possible to its original working order. However, minor repair work that is performed on operational and functional improvements to realty is not taxable repair if the work is done in accordance with paragraph (7) of this subsection.

\* \* \*

(14) Restoration—An activity that is performed to bring back real property that is still operational and functional but that has faded, declined, or deteriorated, as near as possible to its original condition. Minor restorative work that is performed within the meaning of paragraph (7) of this subsection is maintenance, not restoration.

34 Tex. Admin. Code § 3.357(a)(11) - (12), (14) (emphasis added).

In support of its argument that the remedial installation of cathodic protection devices is new construction and not remodeling or repair, Chevron argues that the evidence conclusively

established that remedial installation of additional cathodic protection devices was new construction because it resulted in "the addition of new usable square footage." Chevron's argument misses the point. To qualify as new construction under Rule 3.357, the activity must result in "the addition of new, usable square footage *to an existing structure*." *See* 34 Tex. Admin. Code § 3.357(a)(8) (emphasis added). Although Caskey testified that the remedial cathodic protection devices were installed in new holes or new trenches, this activity does not meet the definition of "new construction" in Rule 3.357.

There is no evidence that the remedial installations of cathodic protection devices expanded the capacity of the existing pipeline. Rather the evidence demonstrates that remedial installation of cathodic protection devices simply prevents the existing pipeline from corroding. Caskey testified that all of the pipelines at issue already had existing cathodic protection devices and that Chevron would only install new anode ground beds when the rectifiers indicated that the existing ground beds were depleted or failing. Caskey also testified that the existing cathodic protection devices would be left in place to provide whatever protection remained. The remedial installations of cathodic protection devices do not add "new, usable square footage to an existing structure" within the meaning of Rule 3.357 and, therefore, do not satisfy the rule's definition of "new construction." To borrow an analogy from major-league baseball, the remedial installation of cathodic protection devices is like adding stadium lights to Wrigley Field.[8] It allows you to use the

---

[8] Although Wrigley Field was originally built in 1914, the Chicago Cubs did not add lights until 1988. The first nighttime game was played on August 8 against the Philadelphia Phillies, but it was rained out after three-and-one-half innings. *See* www.chicago.cubs.nlb.com/NASApp/mlb/chc/ballpark/index.jsp.

10

existing structure for a longer period of time, but it does not increase the usable square footage of the existing structure. Chevron's arguments are contrary to this Court's opinion in *GATX Terminals Corporation v. Rylander*, in which we held that the plain language of Rule 3.357 contemplates something more than "the addition of new *equipment*." *See* 78 S.W.3d at 641. The evidence demonstrates that the existing cathodic protection devices remained in place. Therefore, the trial court could have properly inferred that the remedial installations of additional cathodic protection devices simply upgraded or replaced the protection provided by existing devices. Viewing this evidence in the light most favorable to the verdict, and crediting all favorable evidence that a reasonable fact-finder could believe while disregarding all contrary evidence except that which a reasonable fact-finder could not ignore, we conclude that the evidence was legally sufficient to support the trial court's findings of fact and its conclusion that Chevron was liable for the tax imposed on the installations of remedial cathodic protection devices. *See City of Keller*, 168 S.W.3d at 829-30.

To the extent Chevron cites other Comptroller decisions in support of its claim that remedial installations of cathodic protection devices qualify as non-taxable new construction, Chevron's efforts are unavailing. Because the Comptroller has exclusive jurisdiction to interpret whether a particular service falls within the categories of "taxable services" enumerated in section 151.0101(a) of the tax code, we defer to the Comptroller's construction of Rule 3.357. *See* Tex. Tax Code Ann. § 151.0101(b).[9] None of the decisions cited by Chevron involve remedial installations

---

[9] Section 151.0101(b) states:

The comptroller shall have exclusive jurisdiction to interpret Subsection (a) of

11

of cathodic protection devices. In contrast, the Comptroller has previously and consistently rejected similar claims that remedial installations of cathodic protection devices add new, usable square footage and, therefore, constitute non-taxable, new construction. *See* Hearing Decision No. 31,964 (Tex. Comptroller of Pub. Accounts 1996); Hearing Decision No. 28,327 (Tex. Comptroller of Pub. Accounts 1992). We overrule Chevron's first issue.

### *Excavation and Backfilling Services*

In its second issue, Chevron challenges the legal sufficiency of the evidence to support the trial court's findings that excavation and backfilling services are not "unrelated services" and its conclusion that such services are subject to taxation. Chevron argues that because excavation and backfilling services are non-taxable when provided on a stand-alone basis, such services constitute "unrelated services" within the meaning of Comptroller Rule 3.357(a)(15). We disagree.

The legislature has imposed a tax on each sale of a "taxable item." Tex. Tax Code Ann. § 151.051 (West 2002). The term "taxable item" includes "taxable services." *Id*. § 151.010 (West 2002). Although excavation and backfilling services are not included in the list of taxable services in section 151.0101 of the tax code, *see id*. § 151.0101(a), the Comptroller imposed a tax on those excavation and backfilling services purchased by Chevron in conjunction with its purchases of pipeline recoating services. The parties agree that the pipeline recoating services purchased by Chevron are taxable repair services. *See* Tex. Tax Code Ann. § 151.0101(a)(13); 34 Tex. Admin.

---

this section.

Tex. Tax Code Ann. § 151.0101(b).

12

Code § 3.357(a)(12).  The parties likewise agree that excavation and backfilling services are non-taxable when provided on a stand-alone basis.  *See* Tex. Tax Code Ann. § 151.0101(a).  The dispute at issue thus concerns how to treat, for taxation purposes, excavation and backfilling services purchased in conjunction with pipeline repair services.

Rule 3.357(a)(15) provides:

A service is unrelated if:

(A)   it is not the repair, remodeling, or restoration of nonresidential real property, nor a service or labor that is taxable under any other provision of the Tax Code, Chapter 151;

(B)   it is of a type that is commonly provided on a stand-alone basis; and

(C)   the performance of the service is distinct and identifiable. Examples of unrelated services that may be excluded from the tax base are the creation of engineering plans or architectural designs, new construction, increased capacity, and maintenance on real property.

*Id*. § 3.357(a)(15).  The rule thus establishes a three-prong test for determining whether a service is an "unrelated service." *See id*.  The parties agree that the excavation and backfilling services at issue meet the first prong of this test—*i.e.*, they are non-taxable services.  Their dispute centers on prongs two and three and whether excavation and backfilling services are a type of service that is commonly provided on a stand-alone basis and whether the performance of such services is distinct and identifiable.

At trial, Chevron witness Mark Hildebrand testified that although Chevron at times has excavated and backfilled its pipelines without repairing them, that is not what happened in this case.  According to Hildebrand's testimony, Chevron had already determined that the pipelines were

13

in need of repair, and Chevron excavated the pipelines for the sole purpose of performing the necessary repairs. Hildebrand testified that the underground pipelines could not be recoated without excavating and backfilling and that there were no instances before the trial court in which Chevron contracted solely for excavation and backfilling services. On cross-examination, Hildebrand agreed that the basic purpose of all the contracts at issue was for repair and recoating services for which excavation was required, and not for excavation and backfilling services on a stand-alone basis.

When, as here, a non-taxable service is bundled with the purchase of a taxable service, Texas courts apply the "essence of the transaction" doctrine to determine whether the transaction as a whole is taxable or non-taxable. *See Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 167 (Tex. 1977) (applying "essence of transaction" test to determine whether sale is taxable); *Rylander v. San Antonio SMSA Ltd. P'ship*, 11 S.W.3d 484, 487 (Tex. App.—Austin 2000, no pet.) (same); *Sharp v. Direct Res. for Print, Inc.*, 910 S.W.2d 535, 538-39 (Tex. App.—Austin 1995, writ denied) (same). If the real object of a mixed transaction is the purchase of a taxable service, and other non-taxable services are incident to that purchase, then the entire transaction is taxable. *See Statistical Tabulating Corp.*, 549 S.W.2d at 168; *San Antonio SMSA*, 11 S.W.3d at 487; *Direct Res.*, 910 S.W.2d at 538. If, however, the essence of the transaction is the purchase of a non-taxable service, which incidentally includes the purchase of another taxable service, then the entire transaction is non-taxable. *See San Antonio SMSA*, 11 S.W.3d at 487; *Direct Res.*, 910 S.W.2d at 538.

The evidence presented at trial indicates that Chevron's purchases of non-taxable excavation and backfilling services were incident to its purchases of taxable repair and recoating

14

services. Chevron hired the same third-party contractors to perform both excavation and backfilling services as well as the repair and recoating services. Moreover, as explained by Hildebrand, the process worked like one continuous assembly line. One crew would excavate the pipeline; another would repair or recoat the pipeline; and another crew would follow along and backfill the pipeline once the repairs were completed. In addition, Hildebrand testified on cross-examination that all of the invoices reflected costs for both excavation and backfilling services as well as pipeline repair or recoating services.[10]

Viewing the record as a whole, giving credit to all evidence favorable to the verdict, we find that no reasonable fact-finder could have ignored Hildebrand's uncontroverted testimony that Chevron did not contract solely for excavation and backfilling services and that the underlying purpose of all of the contracts at issue was taxable repair and recoating services. Moreover, no reasonable fact-finder could have determined that the essence of the transactions at issue was solely the purchase of non-taxable excavation and backfilling services. Accordingly, we conclude there was legally sufficient evidence to support the trial court's findings that excavation and backfilling services were required to perform the repair and recoating services and that such services were not distinct and identifiable and, therefore, did not constitute an "unrelated service" within the meaning of Rule 3.357(a)(15). We also conclude that the evidence was legally sufficient to support the trial

---

[10] We reject Chevron's contention that excavation and backfilling services should be treated as non-taxable in those instances where the costs for such services are itemized, or broken out, from the total invoiced amount. The Comptroller has previously determined that "separate billing for different components of a single transaction will not cause the components to be taxed separately." *See* Letter Ruling No. 20010267L (Tex. Comptroller of Pub. Accounts 2001). The Comptroller's determination is consistent with this Court's holding in *Rylander v. San Antonio SMSA Limited Partnership*, 11 S.W.3d 484 (Tex. App.—Austin 2000, no pet.).

court's conclusion that Chevron's purchase of excavation and backfilling services was subject to tax. We overrule Chevron's second issue.

**CONCLUSION**

Having examined the evidence presented at trial, we conclude that there was legally sufficient evidence to support the trial court's findings of fact and conclusions of law. Accordingly, we affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed: August 4, 2006