**WILLIAMS & LEE SCOUTING SERVICE, INC., Appellant,**

**v.**

**Robert S. CALVERT, Comptroller for the State of Texas, Appellee.**

**No. 11744.**

Court of Civil Appeals of Texas, Austin.

March 25, 1970.

Rehearing Denied April 15, 1970.

W. Scott Clark, Fort Worth, for appellant.

Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., John R. Grace, Wardlow Lane, Asst. Attys. Gen., Austin, for appellee.

PHILLIPS, Chief Justice.

This is a sales tax case in which both parties stipulated the facts to be as follows:

"Prior to its actual organization, the owners of Williams & Lee approached a number of large oil companies in 1959 and

proposed to do their scouting for them at a fee, that fee to be low enough to amount to a savings over what they were spending to do their own scouting individually. At the outset, the originators of Williams & Lee were reluctant to initiate the corporation until assured of enough subscribers to make it a sound proposition, and the oil companies were apprehensive about abandoning their own scouting staffs without some assurance the service of Williams & Lee would be efficient. The result was a contract that covered both contingencies—excused Williams & Lee if enough subscribers did not sign up, and allowed the oil companies to take over if Williams & Lee failed to measure up to efficient standards. Although this data is disseminated weekly by Williams & Lee, subscribers often request the information more often than weekly by telephone, and it is furnished by telephone to the subscriber at no extra charge.

Scouting service is the timely procuring of statistical data on oil and gas wells, necessary to keep oil operators informed of developments in their industry. Enough subscribers contracted to subscribe to warrant the incorporation and creation of Williams & Lee Scouting Service, Inc.

Williams & Lee Scouting Service, Inc. began operation in May, 1960. They began obtaining oil and gas well data for the Midland area (about 69 counties) and the Southeastern New Mexico area (about 27 counties) and charged subscribers $950.00 for the data in the Midland area and $500.00 in the New Mexico area. Later Abilene and Wichita Falls areas were added; the cost for a subscription to all areas now runs over $2,000.00 per month. The data is all gathered, compiled and distributed to subscribers by employees of Williams & Lee Scouting Service, Inc. and not by the subscribers or employees of subscribers.

In compiling the data, Williams & Lee Scouting Service, Inc. employs fifteen or sixteen scouts and uses fifteen automobiles constantly in the field. The cars run between eighty thousand and one hundred thousand miles each every eighteen months. The scouts are trained and experienced in oil and gas, and about half of them are geologists. They search out facts and data on developments in the field. They quiz operators, geologists, drilling crews and service companies for information while wells are drilling. Statistics obtained on logs and from contacts in the field are edited (i. e., summarized, but not analyzed) by Williams & Lee and transmitted to its subscribers before the data becomes generally known; it is vital, fresh statistical information that gives subscribers a competitive advantage over non-subscribers. The reports furnished subscribers include data that never becomes public record, such as tests, cores, and information that is not put into the reports that go to the Railroad Commission of Texas.

These reports enable subscribers to keep up with 'shows' on wells in the process of drilling. What the well 'shows' will govern what a subscriber is going to do in that area—whether it will send in equipment on a tract nearby to avoid losing a lease that is about to expire, etc.

The reports of this data are duplicated in offset printing at the Williams & Lee offices in Midland. Sometimes Williams & Lee takes the handwritten notations of the field representative and simply reproduces them, and sometimes they edit and summarize the information. Copies of specimen reports are attached to the plaintiff's petition and are considered a part of this stipulation of facts. The reports are distributed to the subscribers for a subscription fee that ranges from about $500.00 to over $2,000.00 per month, depending upon how many areas from which they want the oil well statistics. If they want extra copies, an additional charge of some $3.00 to $5.00 (depending upon how voluminous they are) is assessed for the duplicate copies.

Contracts with subscribers are on a continuing annual basis subject to cancella-

tion by the subscriber annually by giving ninety (90) days advance notice in writing (and by Williams & Lee by giving sixty days notice).

The Comptroller assessed this sales tax in a Redetermination dated March, 1967, retroactive to October 1, 1961. Plaintiff paid under protest and exhausted its administrative remedies when the Comptroller issued a Notice of Disallowance of Claim for Refund May 28, 1968.

## II.

The reports are furnished to the subscribers and the subscriptions are paid to Williams & Lee pursuant to contracts between Williams & Lee Scouting Service, Inc., and their subscribers. Such contracts are identical except for the name and subscriber and the area covered add a true and correct copy of such contract, marked Exhibit 'A', is attached hereto and expressly made a part hereof.

## III.

The articles of incorporation are also attached hereto and labeled Exhibit 'B,' and are expressly made a part hereof. It is agreed that this is a true and correct copy of said article of incorporation.

## IV.

That subscription are for one year and the subscriber specifies which of the reports offered by Williams & Lee Scouting Service, that he is subscribing for. The reports are separated into the 'geographical areas' for which the reports are made. A subscriber may subscribe to all reports made by Williams & Lee Scouting Service or he may subscribe only to a single area if that area is separately reported on. The subscription price varies between the areas reported on.

## V.

The tax which was assessed and which is the subject of this suit was based on gross receipts of Williams & Lee Scouting Service, Inc. from the subscription contract price paid by subscribers. Williams & Lee has not argued the validity of the tax as applied to the extra copy charges ($5.00 or less per order of extra copies).

## VI.

The information reported is only partially obtained from subscriber's operations and the majority of said information is obtained from operations of non-subscribers.

## VII.

The subscription contract attached hereto, provided that

'information gathered by SERVICE hereunder shall be for the exclusive use of its SUBSCRIBERS in the ordinary course of their business * * *,'

and the information may not be given, loaned, sold or published for the purposes of dividing up the cost of the subscriptions or assisting a non-subscriber in evading the subscription price. The number of subscribers is not limited and Williams & Lee Scouting Service, Inc., is not limited in the number of subscribers to the reports it furnishes. Copies of the reports furnished by Williams and Lee Scouting Service, Inc. are attached hereto and labeled Exhibit C, and incorporated herein as though set out in full."

Appellant paid the taxes under protest and brought suit in the District Court of Travis County for a refund of the payment pursuant to Article 1.05, Title 122A, Taxation-General, V.A.T.S.

The trial court rendered judgment for Appellee.

We reverse and render judgment for Appellant.

Appellant is before us on two points of error. Since we sustain the first point, it

will not be necessary for us to consider the second.[1]

Appellant's first point of error, which we sustain, is that the essence of the transaction involved in this instance is the performance of a *service* for oil companies, namely, a scouting service, and the sales tax has not been extended by the legislature to cover services.

■ The basic question here is what is being sold? Appellant contends that it is selling a service, Appellee contends that the sale consists of scouting reports which, in turn, consists of information presented in a permanent, tangible, form. The law places a tax on "tangible personal property."[2]

Part of the data furnished by Appellant can be obtained from the records of the Railroad Commission and from other reporting periodicals; however, the company subscribers require the statistics while they are fresh in order to keep up with the developments in the field. The interested company either has to obtain the data itself or hire someone to do it. Thus a service is performed by Appellant. Timeliness of the data is highly important to competing oil companies. If the data was not reported, at least weekly, it would lose its critical value. This reporting can take any form from handwritten notes, tele-phone or telegraph communications to printed material. The method of its communication is unimportant. The value lies in the intangible facts secured by the service. Even so, these facts reported by the service are of value only to those interested in the geographical area scouted.

The State contends that the periodic reporting makes this service a periodical; however, the cost of the service itself, in the neighborhood of $1,800.00 per month, would preclude such definition. It is apparent from the high cost of subscription that it is necessary for Appellant to pay fifteen or sixteen scouts, each using an automobile, to roam the oil fields of West Texas and New Mexico. If a subscriber desires extra copies of the statistical data reports they are available from $3 to $5 per copy. This price differential in itself is a graphic demonstration of the intangible as distinguished from tangible importance of the service.

■ While there are, apparently, no cases in point in Texas, the Supreme Court of Maine in Community Telecasting Service v. Johnson, 220 A.2d 500, held that pamphlets sold to a television station containing results of market surveys which indicated which programs audiences were watching, represented the performance of a service so that the transaction was not subject to the use tax. The Court held

---

1. Appellant's second point is as follows: "The interpretation of the Comptroller and lower court favors form over substance, and is (a) erroneous, (b) unconstitutional, and (c) incongruous, since it assumes the legislature intended to discriminate against Texas based oil companies."

2. The pertinent portions of the Texas Sales Tax Act are set out as follows: "Article 20.02. There is hereby imposed a limited sales tax at the rate of three and one-fourth per cent (3¼%) on the receipts from the sale at retail of all taxable items within this State." "Article 20.01(W) Taxable Items. 'Taxable Items' means tangible personal property." "Article 20.01(D) (1) 'Receipts' means the total amount of the sale or lease or rental price, * * * of the retail sales of taxable items by retailers, * * * without any deduction on account of any of the following: * * * (b) The cost of the materials used, labor or service costs, interest paid, losses or other expenses. * * * (L) * *. * (2) The total amount for which a taxable item is sold includes all of the following: (a) Any services which are a part of the sale. * * * *"

"Article 20.04(T) There are exempted from the taxes imposed by this Chapter the receipts from the sale, lease or rental of, and the storage, use or other consumption in this State of books consisting wholly of writings sacred to any religious faith and religious periodicals published or distributed by any religious faith consisting wholly of writings promulgating the teachings of such faith."

that the survey itself was being bought, not the *product* of the survey as tangible personal property. For analogous cases see 139 A.L.R., p. 382. In construing the statutory reach of the tax we must follow the rule that the statute is construed with strictness against the taxing authority. Texas Unemployment Compensation Comm. v. Bass, 137 Tex. 1, 151 S.W.2d 567 (1941); Wilson Communications, Inc. v. Calvert, Tex., 450 S.W.2d 842, handed down February 18, 1970.

The judgment of the trial court is reversed and judgment rendered that Appellant be refunded the taxes paid under protest and interest as provided by law.

Reversed and rendered.