TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00212-CV






7-Eleven, Inc., Appellant


v.


Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott,
Attorney General of the State of Texas, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT

NO. D-1-GN-04-003369, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING




O P I N I O N 


 Appellant 7-Eleven, Inc. brought suit against Susan Combs, Comptroller of Public
Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas
(collectively, the "State") seeking a partial refund of sales tax that the Comptroller assessed on
7-Eleven's purchase of financial software for its retail stores. The parties filed cross-motions for
summary judgment; the trial court granted the State's motion and denied 7-Eleven's. On appeal,
7-Eleven asserts that it was entitled to recover taxes assessed on the portion of the sales price of the
software that was (1) transferred to stores operated by third-party franchisees, all of which were
outside of Texas, and (2) delivered to those 7-Eleven-operated stores ("company stores") that were
located outside of Texas. We will reverse the summary judgment in favor of the State, render
judgment that 7-Eleven is entitled to a partial sales-tax refund with respect to the software that it
transferred to its franchise stores, and remand to the trial court the portion of the cause pertaining
to software that was delivered to its out-of-state company stores.


FACTUAL AND PROCEDURAL BACKGROUND

 7-Eleven is a Texas corporation that operates retail convenience stores, and franchises
others, throughout the United States. In 1993, 7-Eleven purchased a license to "use, reproduce, and
possess" custom computer software developed by Canmax Retail Systems, Inc. and designed to
manage and automate 7-Eleven's stores. The Canmax software was developed and implemented in
several phases. In the initial phase, "host software" was installed on 7-Eleven's corporate
mainframe, referred to as the "host" computer, while "store software" was installed on the in-store
computers. According to Paul Hanson, who managed 7-Eleven's Internal Audit Division during the
relevant period, Canmax delivered separate "gold masters" of the host software and the store
software. As Hanson explained in his deposition testimony, the host software permitted the
corporate mainframe to communicate directly with the store computers, allowing the stores to
transmit data to the corporate mainframe for processing. Hanson testified that a distinction was
made between the host software and the store software because those were "two separate things"
"based upon where that software resided and what it did."

 Hanson testified extensively concerning the functionality and use of the Canmax
software, both by the 7-Eleven corporate office and by the stores themselves. Hanson stated that the
Canmax software was the "backbone" of 7-Eleven's financial records because it captured the data
necessary to conduct and monitor sales and other store functions. The software's "data-capture"
function replaced the system of manually submitting data from a store to 7-Eleven's corporate office
on written forms. He also explained how 7-Eleven used the software to then perform
"data-processing services" for the stores based on the information that was entered at the store level
and transmitted electronically to the host computer. (1) In one example, Hanson discussed the
preparation of a payroll report, which would be generated by the host computer and provided to the
stores on a weekly basis, showing the "gross to net pay calculation" for each employee during each
pay period. In another example, Hanson explained how the Canmax store software could be used
"as a tool to help control the receipts or cash in the store and assign that to individual shifts, to
individual employees, to hold them accountable." Such data, Hanson explained, would not
necessarily be transmitted "up to the mainframe," but rather would be used in "purely a store-level
report to help the store manage its operation."

 Kathy Naumann, who was 7-Eleven's information systems manager during the
relevant period, also testified by deposition about the Canmax software's functionality and how it
permitted the store computers to interface with the corporate host computer. Referring specifically
to phase one of the Canmax store software, Naumann stated that it "processed--collected the
information for--and created the cash report" and allowed for "the gathering of timesheet data for
payroll purposes, the gathering of gasoline inventory measurements, the gathering of gasoline
delivery invoice information, the gathering of detail sales data for money orders and the gathering
of transaction information for credit card sales."

 The next phase of the store software, according to Naumann, "ran on a scanning cash
register" and fed information that it collected from the cash register to the in-store computer. This
phase of the store software (referred to as "Pre-POS") was installed only in franchise stores located
outside of Texas; it was not installed on the host computer or at any company stores.

 The final software phase relevant to this appeal, Phase 2B, included "scanning point-of-sale registers," designed to replace non-scanning, Pre-POS software in the stores. The Phase 2B
software's "key functionality" was to automate the stores' ordering system. As Naumann explained,


The stores have in their store software their inventory items and the software allows
them to place an order for each vendor for each merchandise item and then that order
is uploaded to the host software and from there sent to the vendors and the CDCs
[consolidated distribution centers] so that they can deliver that merchandise to
the stores.



Like the Pre-POS software, the Phase 2B software was installed only in the stores, not at the host. (2) 
By 1996, 7-Eleven had installed Canmax software at 286 company stores in Texas, 1,742 company
stores outside of Texas, and 2,946 franchise stores. All of the franchise stores were outside of Texas.

 Before installation of the Phase 2B store software was underway, the
Comptroller audited 7-Eleven for sales-tax compliance for the period of April 1, 1993, through
September 30, 1996. The auditor determined that the amount of the software licensing fee
attributable to the retail store software during the audit period was $3,628,230, and assessed sales
tax on the store software in the amount of $299,328.98. (3)

 After exhausting its administrative remedies and paying the tax under the
statutory protest procedures, 7-Eleven filed suit for a tax refund under chapter 112 of the tax code. 
See Tex. Tax Code Ann. §§ 112.001-.056 (West 2008). 7-Eleven sought a partial refund in the
amount of $282,118, plus penalties and interest. According to 7-Eleven, this sum represented the
portion of the sales price attributable to the store software that was either (1) transferred to
third-party franchisees outside of Texas or (2) delivered to 7-Eleven-operated stores outside of
Texas, neither of which should be subject to Texas sales and use tax. 7-Eleven argued that the
software transferred to the franchise stores qualified for the sale-for-resale exemption in section
151.302 of the tax code. See id. § 151.302(b) (West 2008) (providing that sale for resale of taxable
item is exempted from sales and use tax); see also id. § 151.006(3) (defining "sale for resale" to
mean sale of tangible personal property to purchaser who acquires property for purpose of
transferring it in United States as integral part of taxable service). Therefore, 7-Eleven urged that
it was entitled to purchase all of the store software tax-free and place it in a "tax-free inventory"
because it intended to resell some of the software to its franchisees. With respect to the software that
was ultimately shipped to company stores outside of Texas, 7-Eleven asserted that the relevant
inquiry is whether use tax--not sales tax--was due; thus, because the store software shipped to
out-of-state company stores "was never used in Texas," 7-Eleven maintained that "it was not subject
to the Texas use tax under Texas Tax Code § 151.011(f)." See id. § 151.001(f) (West 2008)
(providing that "use" does not include exercise of right or power over tangible personal property for
purpose of transporting it outside state for use solely outside Texas).

 7-Eleven moved for summary judgment, attaching to its motion, among other
evidence, Hanson's calculation that 7-Eleven would be entitled to a refund of $282,118 in the event
the court concluded that the copies of the software delivered to out-of-state company and franchise
stores were not taxable. (4)

 7-Eleven also attached a copy of a Store Franchise Agreement, which indicates that
7-Eleven provides data-processing services to its franchisees--including bookkeeping, payroll, and
accounts payable--as part of the bundle of services, the license of 7-Eleven's service mark and
proprietary products, and the lease of the store and equipment for which the franchisees pay 7-Eleven
a lump-sum monthly payment referred to as "the 7-Eleven Charge." Regarding these services, the
Store Franchise Agreement states:


If FRANCHISEE is not in breach of this Agreement, 7-ELEVEN shall: (i) provide
Financial Summaries for FRANCHISEE for the Store prepared from the
Bookkeeping Records in the form of an income statement and a balance sheet for
each Accounting Period or any portion thereof as 7-ELEVEN may deem necessary
and for each calendar year, payroll checks for FRANCHISEE's Store employees,
draw checks, and merchandise reports; (ii) timely pay on behalf of FRANCHISEE,
upon approval and submission to 7-ELEVEN, bank drafts and invoices for Purchases
(as verified by vendor statements), bills for Operating Expenses, and the payroll for
FRANCHISEE's Store employees; and (iii) assist FRANCHISEE in the preparation
and filing of business tax reports and returns (except FRANCHISEE's income
tax and related returns) to the extent the information is available from the
Bookkeeping Records.



The Store Franchise Agreement further provides:


FRANCHISEE shall prepare and furnish to 7-ELEVEN, on forms and at times
acceptable to and as requested by 7-ELEVEN: (i) daily summaries of Purchases;
(ii) daily reports of Receipts; (iii) weekly time and wage authorizations for
FRANCHISEE's Store employees; (iv) all information requested by 7-ELEVEN
regarding the vendors from which FRANCHISEE makes purchases; and (v) all such
additional reports as 7-ELEVEN may require from time to time.



In his affidavit attached to 7-Eleven's motion for summary judgment, Hanson averred that the
Canmax software was an integral part of the data-processing service provided by 7-Eleven "because
it provided the method and the means" by which the franchisees recorded their financial information
and transmitted it to the host computer for processing.

 The State filed a cross-motion for summary judgment, asserting that the
sale-for-resale exemption was not applicable to the software transferred to the franchise stores
because the essence of that transaction "was a purchase of stores-automation software, not a purchase
of software that is an integral part of data processing services." Specifically, the State argued that
(1) any franchise store who received the software did some of its own data processing using the
software; (2) the benefits provided to franchise stores using the software were not exclusively data
processing; (3) 7-Eleven received as much or more of a benefit than the stores from the store
software; and (4) 7-Eleven made a divergent use of the software. The State further asserted that
section 151.011(f), the statute defining "use," is not a sales-tax exemption to be applied to the
software transferred to out-of-state company stores.

 The trial court granted the State's motion for summary judgment, denied 7-Eleven's
motion, and ordered that the State retain the taxes at issue. 7-Eleven appeals, arguing by one issue
that it is entitled to a partial refund of the taxes paid on the copies of the software transferred to
third-party franchisees and company stores outside of Texas.


STANDARDS OF REVIEW

 To be entitled to summary judgment, the movant must establish that no genuine issue
of material fact exists and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). 
In our de novo review of a summary judgment, "we indulge every reasonable inference and resolve
any doubts in the nonmovant's favor." Southwestern Elec. Power Co. v. Grant, 73 S.W.3d 211, 215
(Tex. 2002). When, as here, both parties move for summary judgment on overlapping issues and
the district court grants one motion and denies the other, we review the summary-judgment evidence
presented by both sides, determine all questions presented, and render the judgment that the district
court should have rendered. Texas Workers' Comp. Comm'n v. Patient Advocates, 136 S.W.3d 643,
648 (Tex. 2004).

 The issues raised in this appeal turn on the construction of the tax code and the
Comptroller's rules. Statutory construction is a question of law that we review de novo. See Bragg
v. Edwards Aquifer Auth., 71 S.W.3d 729, 734 (Tex. 2002). In construing statutes, we ascertain and
give effect to the legislature's intent as expressed by the language of the statute. Id.; State
v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). We use definitions prescribed by the legislature and
consider any technical or particular meaning that the words have acquired. Tex. Gov't Code Ann.
§ 311.011(b) (West 2005). Otherwise, we construe the statute's words according to their plain
and common meaning, Texas Dep't of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642
(Tex. 2004), unless a contrary intention is apparent from the context, Taylor v. Firemen's
& Policemen's Civil Serv. Comm'n, 616 S.W.2d 187, 189 (Tex. 1981), or unless such a construction
leads to absurd results, University of Tex. Sw. Med. Ctr. v. Loutzenhiser, 140 S.W.3d 351, 356 (Tex.
2004); see also Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc., 145 S.W.3d
170, 177 (Tex. 2004) (noting that when statutory text is unambiguous, courts must
adopt interpretation supported by statute's plain language unless that interpretation would lead to
absurd results).

 "We construe administrative rules, which have the same force as statutes, in the same
manner as statutes." Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248, 254 (Tex. 1999). 
"Unless the rule is ambiguous, we follow the rule's clear language." Id. We defer to an agency's
interpretation of its own rule when the rule is vague or ambiguous, unless the administrative
interpretation is "plainly erroneous or inconsistent with the regulation." See id. at 254-55 (quoting
Public Util. Comm'n v. Gulf States Util. Co., 809 S.W.2d 201, 207 (Tex. 1991)).


DISCUSSION


 On appeal, 7-Eleven urges that the software transferred to third-party franchisees
qualified for the sale-for-resale exemption. It further asserts that, because it intended to resell some
of the Canmax store software to its franchisees, it was initially entitled to purchase all of the
software--including the software that it ultimately transferred to its company stores in and outside
of Texas--without paying sales tax by putting all of the software in a "tax-free inventory." Thus,
according to 7-Eleven, the issue regarding the software that it did not resell to its franchise stores
(i.e., that it transferred to its company stores) is whether that software was used in Texas. (5) We will
address each argument in turn.


I. Franchise Stores

 (A) The State's Entitlement to Summary Judgment

 (1) Sale-for-Resale Exemption

 The State was granted summary judgment partly on the basis that 7-Eleven was not
entitled to claim the sale-for-resale exemption as to the Canmax store software that it purchased for
and delivered to its franchise stores, all of which were located outside of Texas. See Tex. Tax Code
Ann. § 151.302(a) ("The sale for resale of a taxable item is exempted from the taxes imposed by this
chapter."). The purpose of the sale-for-resale exemption is to prevent double taxation. Sharp
v. Clearview Cable TV, Inc., 960 S.W.2d 424, 426 (Tex. App.--Austin 1998, pet. denied) ("[T]he
Tax Code recognizes that the same goods should not be taxed twice; only the ultimate owner of the
goods should be burdened by the sales tax."). Tax exemptions are to be strictly, but reasonably,
construed against the taxpayer. Id.; see North Alamo Water Supply Corp. v. Willacy County
Appraisal Dist., 804 S.W.2d 894, 899 (Tex. 1991). An exemption cannot be raised by implication,
but must affirmatively appear in the statute, and all doubts are resolved in favor of the taxing
authority and against the claimant. Bullock v. National Bancshares Corp., 584 S.W.2d 268, 272
(Tex. 1979).

 Under the tax code, "sale for resale" includes a sale of "tangible personal property
to a purchaser who acquires the property for the purpose of transferring it . . . as an integral part of
a taxable service." Tex. Tax Code Ann. § 151.006(3) (West 2008). (6) 7-Eleven asserts, and the State
does not dispute, that its transfer of the store software to its franchisees qualifies as a sale. See id.
§ 151.005(1), (2) (defining "sale" to include both "a transfer of title or possession of tangible
personal property" and "the exchange, barter, lease, or rental of tangible personal property"). A
"taxable service" is defined to include "data processing services," see id. § 151.0101(a)(12)
(West 2008), which is in turn defined to "include[] word processing, data entry, data retrieval, data
search, information compilation, payroll and business accounting data production, the performance
of a totalisator service with the use of computational equipment required by the Texas Racing Act,
and other computerized data and information storage or manipulation," see id. § 151.0035
(West 2008) (internal citations omitted). "'Data processing service' also includes the use of a
computer or computer time for data processing whether the processing is performed by the provider
of the computer or computer time or by the purchaser or other beneficiary of the service." Id.

 The tax code further provides that the Comptroller shall have exclusive jurisdiction
to interpret the statute defining "taxable service." See id. § 151.0101(b). The Comptroller's rule
interpreting section 151.0101 states that data-processing services "specifically includes word
processing, payroll and business accounting, and computerized data and information storage or
manipulation" and notes that examples of data-processing services "include entering inventory
control data for a company, maintaining records of employee work time, filing payroll tax returns,
preparing W-2 forms, and computing and preparing payroll checks." See 34 Tex. Admin. Code
§ 3.330 (2009) (Tex. Comptroller of Pub. Accounts, Data Processing Services).

 7-Eleven argues that the record establishes conclusively that it performed data-processing services for its franchise stores. We agree. Pursuant to the Store Franchise Agreement,
for example, 7-Eleven was required to compute and provide its franchisees financial summaries,
merchandise reports, and payroll checks, all of which were based on and prepared from the store's
bookkeeping records. In addition, the Store Franchise Agreement sets forth that 7-Eleven was
required to assist its franchisee in the preparation and filing of business tax reports and returns, "to
the extent the information is available from the Bookkeeping Records." The bookkeeping records
consist of data that is entered, transmitted, received, and processed using the Canmax system
software. 7-Eleven thus argues that the Canmax software was an "integral part" of the
data-processing services it provided because the software offered "the method and the means by
which the franchisees recorded the financial information and transmitted it to 7-Eleven
for processing."

 The State argues in response that the transfer of the Canmax software was not, in fact,
integral to the data-processing services 7-Eleven provides to its franchisees because the evidence
demonstrates that the true purpose of the software was to automate 7-Eleven's stores for 7-Eleven's
own benefit. The State points to evidence that 7-Eleven's corporate divisions received copies of
reports that were provided to the stores and that data collected using the store software was used by
7-Eleven in preparing its own tax returns, setting its gasoline prices, and performing corporate
accounting and audit functions. According to the State, the "purpose" requirement of section
151.006 is not met because "7-Eleven's actual use of the Software clearly evidences a purchase for
its own use, as opposed to a transfer of Software to a third party as part of a resale transaction." (7) In
essence, the State argues that, in order for 7-Eleven's purchase of the software to qualify as a sale
for resale under section 151.006, the transfer of the store software from 7-Eleven to its franchisees
cannot have provided any "direct benefit" to 7-Eleven. We disagree.

 In the first place, nothing in the statute indicates that the purchaser of tangible
personal property who transfers it as an integral part of a taxable service may not obtain any benefit
from the transaction. Neither the statute's plain text nor its context within chapter 151 suggests that
the derivation of a "benefit" by the party performing the taxable service negates what would
otherwise qualify for the sale-for-resale exemption. See In re Bell, 91 S.W.3d 784, 790 (Tex. 2000)
("courts should not insert words in a statute except to give effect to clear legislative intent");
Williams v. Texas State Bd. of Orthotics & Prosthetics, 150 S.W.3d 563, 573 (Tex. App.--Austin
2004, no pet.) ("[W]e will not read into an act a provision that is not there . . . ."). Thus, evidence
that 7-Eleven's corporate divisions also reviewed and benefited from reports that were generated
using the store software, for example, does not alter the fact that the transfer of the store software
to the franchisees was integral to 7-Eleven's performance of data-processing services. Cf. Strayhorn
v. Raytheon E-Systems, Inc., 101 S.W.3d 558, 567 (Tex. App.--Austin 2003, pet. denied) (rejecting
Comptroller's argument that reseller's control over property for its own use defeated its claim for
sale-for-resale exemption, noting that nothing in tax code required sale to hinge on elements of
control and use). So long as the purchaser's intent in acquiring the property was to transfer it as an
integral part of a taxable service, the elements of the section 151.006(3) definition would appear to
be satisfied.

 Moreover, even interpreting the statute to permit consideration of the benefits
allegedly received by the parties to the transaction, we disagree that the statute contains a
requirement that the recipient of the service be the sole benefiting party. Such a construction would
impose on the party seeking eligibility for the sale-for-resale exemption an impractical burden,
requiring a showing not only that the transfer of the property was integral to its provision of a taxable
service, but also that the transferor of the property received no benefit from the transfer beyond
receipt of the sales price. See Tex. Gov't Code Ann. § 311.021(3) (West 2008); Old Am. County
Mut. Fire Ins. Co. v. Sanchez, 149 S.W.3d 111, 117 (Tex. 2004) (requiring that we reject statutory
interpretation that would lead to unreasonable result). The more reasonable interpretation of the
"purpose" requirement is that it exists to prevent parties from obtaining favorable tax treatment
premised on a sham arrangement wherein little or no taxable services are actually rendered. This
is consistent with the sale-for-resale exemption's purpose being to avoid double taxation, because
if there is no performance of significant services that would be subject to sales and use tax, taxing
any tangible personal property integral to the performance of those services would not result in
double taxation.

 Here, even taking into account the benefits that 7-Eleven received, (8) the
summary-judgment record does not show that the effects of the store software were so one-sided in
7-Eleven's favor that its claim to have purchased the software as an integral part of its provision of
data-processing services is merely pretense. On the contrary, the record shows that the franchisees
derived a substantial actual benefit from the taxable services rendered by 7-Eleven. The evidence
is undisputed that 7-Eleven used the store software to perform payroll and accounting functions for
the franchisees; to store and manipulate the stores' computerized data and information, including
inventory data; to maintain records of store employee work time; and to compute and prepare the
store employees' payroll checks--all of which are identified as data-processing services in the
Comptroller's rule defining that term. See 34 Tex. Admin. Code § 3.330.

 The State further argues that 7-Eleven cannot avail itself of the sale-for-resale
exemption because some aspects of the store software--specifically Phase 2B--were "unrelated"
to the performance of data-processing services. The record shows that Phase 2B was designed to
permit the stores to upload their merchandise orders to the host computer, which processed and
transmitted the order data to the vendors for the purpose of supplying merchandise to the stores. 
Naumann testified that Phase 2B included "transmission of order information" to 7-Eleven's
consolidated distribution centers and vendors, as well as "sales trend information for the stores."

 We reject the State's argument for two reasons. First, as a matter of law, we do not
construe the statute to require that the tangible personal property be committed solely to the
performance of the taxable service in order for section 151.006(3) to be satisfied. Rather, the statute
is phrased in terms of whether the taxable service could be completed but for the tangible personal
property--i.e., whether the property is "an integral part of a taxable service." See Tex. Tax Code
Ann. § 151.006(3); see also Webster's Third New Int'l Dictionary 1173 (1986) ("integral" means
"of, relating to, or serving to form a whole; essential to completeness; constituent; inherent"). 
Because the evidence confirms that the store software was essential to the performance of
data-processing services that were performed by 7-Eleven, it is not relevant under the statute that the
store software may have been put to other uses as well. (9) Further, as a matter of fact, the evidence
shows that even the Phase 2B software was integral to 7-Eleven's "storage and manipulation" of the
Store's computerized sales-trend and merchandise-ordering data, processes that are expressly defined
as data-processing services under the tax code. See Tex. Tax Code Ann. § 151.0035
(data-processing services specifically include data entry, data retrieval, data search, information
compilation, and other computerized data and information storage or manipulation). Based on our
review of the record, we disagree with the State's contention that "only a small portion" of the
Canmax store software was used for data-processing services. (10)

 (2) "Essence-of-the-Transaction" Test

 In a separate but related argument, the State argued in its motion for summary
judgment that 7-Eleven was not entitled to purchase the Canmax store software tax-free because the
software purchase fails the judicially created "essence-of-the-transaction" test. According to the
State, the store software was purchased not for the purpose of providing data-processing services for
7-Eleven's stores, but was instead done to automate 7-Eleven's operations and to protect 7-Eleven's
franchise fee. These purposes, the State argues, reveal that the essence of the transaction between
7-Eleven and its franchisees was not the transfer of tangible personal property as an integral part of
a taxable service, and therefore 7-Eleven is not entitled to the sale-for-resale exemption.

 The essence-of-the-transaction test was developed to address situations involving a
"mixed transaction" of both taxable and nontaxable elements. See, e.g., Bullock v. Statistical
Tabulating Corp., 549 S.W.2d 166, 167 (Tex.1977); Rylander v. San Antonio SMSA Ltd. P'ship,
11 S.W.3d 484, 487 (Tex. App.--Austin 2000, no pet.); Williams & Lee Scouting Serv. Inc.
v. Calvert, 452 S.W.2d 789, 792 (Tex. Civ. App.--Austin 1970, writ ref'd). In Williams & Lee, the
case in which the essence-of-the-transaction test was first applied, the Comptroller assessed sales
tax on printed reports produced by a company performing scouting services for oil companies. (11) 
452 S.W.2d at 790. The printed materials summarized the oil and gas well data that the company
gathered and furnished to its subscribers for a monthly charge, but the record showed that the same
information was also communicated by telegraph and over the telephone, rather than in printed
reports. Id. at 790-91. The scouting company challenged the tax assessment, arguing on appeal that
"the essence of the transaction involved in this instance is the performance of a service for oil
companies, namely, a scouting service." Id. at 792. At that time, the sales tax had not been extended
by the legislature to cover services. Id. Therefore, in order to determine whether the scouting reports
were subject to sales tax, the Williams & Lee court focused its inquiry on what was really being
sold--a scouting report, which consisted of information presented in a permanent, tangible form and
was therefore taxable, or a service, which was not taxable. Id. The court held that because the value
from the standpoint of the subscriber was in the information itself, regardless of what form the
information took, the true transaction was the selling of a service and therefore was not subject to
sales tax. Id. at 792-93.

 Subsequently, courts have applied the essence-of-the-transaction test to other
scenarios involving the bundling of a nontaxable service with a taxable sale or service. 
See, e.g., Statistical Tabulating, 549 S.W.2d at 167 (holding essence of transaction was nontaxable
data-processing service, which was performed by translating raw data onto punch cards that
customers fed in to computer; court therefore held that transfer of punch cards was not taxable sale);
San Antonio SMSA, 11 S.W.3d at 487 (holding that nontaxable engineering services bundled with
sale of telecommunications equipment was not taxable); Comptroller of Pub. Accounts v. Austin
Multiple Listing Serv., Inc., 723 S.W.2d 163, 165 (Tex. App.--Austin 1986, no writ) (holding
essence of transaction was processing of real-estate data, rather than printing of weekly
listing-service book).

 As this Court explained in San Antonio SMSA, the essence-of-the-transaction test
involves the following inquiry:


If the real object of a mixed transaction is the purchase of equipment which is
taxable, and the service element is incident to that purchase, the entire transaction is
taxable. On the other hand, if the essence of the transaction is the purchase of a
nontaxable service, which incidentally includes the purchase of some other service
or equipment that is taxable, the entire transaction is nontaxable.


11 S.W.3d at 487 (citations omitted). Ultimately, this Court in San Antonio SMSA determined that
the transaction at issue, which involved the performance of nontaxable engineering services as part
of the taxable sale of telecommunications equipment, did not fall into either category because "each
transaction is independently desired and independently provided." Id. Therefore, the Court
recognized a third category in which the two elements of a mixed transaction involving service and
tangible property are "'readily separable': 'When there is a fixed and ascertainable relationship
between the value of the article and the value of the services rendered, and each is a consequential
element capable of a separate and distinct transaction, then the elements must be analyzed as
separate transactions for tax purposes.'" Id. at 488 (quoting New England Tel. & Tel. Co. v. Clark,
624 A.2d 298 (R.I. 1993)).

 The transaction involved in the instant case conforms even less to the traditional
essence-of-the-transaction inquiry. The issue here is not whether the "essence" of the
7-Eleven-franchisee transaction was a taxable sale or a nontaxable service, see Statistical
Tabulating, 549 S.W.2d at 167; Austin Multiple Listing Serv., 723 S.W.2d at 165, or even whether
we can logically "unbundle" the taxable and the nontaxable elements of a single transaction, as in
San Antonio SMSA. Rather, both the tangible personal property and the services at issue in this
appeal are taxable. (12) Yet the State purports to invoke the essence-of-the-transaction doctrine to show
that any "[s]oftware that may have been transferred as an integral part of data processing services
was merely 'incident to' the 'basic purpose' of this transaction."

 As we understand the State's argument, it is that the essence-of-the-transaction test
proves that 7-Eleven's motivation for transferring the store software to its franchisees was to obtain
a financial benefit for itself, not to transfer the software as an integral part of data-processing services
provided to the franchisees. In other words, the State wants to use the test to show that 7-Eleven was
not engaged in "a true resale transaction." The State has cited no authority, nor have we found any,
indicating that the essence-of-the-transaction doctrine has ever been applied in this manner. We
conclude that it does not apply here, and that the function of that test has effectively been
incorporated into the definition of "sale for resale" regarding whether tangible personal property is
"an integral part of a taxable service." See Tex. Tax Code Ann. § 151.006(3). (13)

 (3) Policy Considerations

 The State further argues that allowing the store software purchase to escape sales tax
would contravene the purpose of the sale-for-resale exemption, which is to prevent double taxation. 
In this case, as the State points out, there is no evidence that 7-Eleven charged or collected sales tax
for any of the data-processing services it performed for out-of-state franchise stores. Therefore, the
State urges that, as a matter of public policy, 7-Eleven should be precluded from claiming the
exemption in the absence of evidence that it actually charged sales tax to its franchisees "for the
provision of these asserted taxable data processing services."

 7-Eleven responds that the sale-for-resale exemption does not require that the reseller
actually collect sales tax on the taxable item, analogizing to resale transactions between contractors
and the federal government. See Day & Zimmerman, Inc. v. Calvert, 519 S.W.2d 106, 110-11
(Tex. 1975) (holding that contractor who transferred title of items to federal government could claim
sale-for-resale exemption even though ultimate resale would not actually be taxed, based on
constitutional prohibition against states taxing federal government ); see also Ratheon E-Systems,
101 S.W.3d at 568, 570 (applying Day & Zimmerman analysis to contractor's purchase of tangible
overhead materials allocated as indirect costs to contracts with federal government and holding that
purchase qualified for sale-for-resale exemption).

 We find 7-Eleven's analogy to these cases to be apt. The sale-for-resale statute
simply requires that the service to which the transfer of tangible personal property is integral be a
taxable service--not that it actually be taxed in the particular instance in question. See Tex. Tax
Code Ann. § 151.006(3). While it may be true that 7-Eleven will avoid paying sales tax on some
of the software that it purchased for transfer to its stores, this is the result mandated by the
plain language of the tax code exemption. The courts have long refused to enforce strained
readings of tax-exemption statutes for the purpose of preventing lost revenue to the State. 
See, e.g., Schlusselberg v. Calvert, 443 S.W.2d 695, 697 (Tex. 1969) (holding that such claims
"should be addressed to the Legislature, because it is our opinion that the statute as written is too
plain to admit any construction other than that adopted by the trial court" permitting application of
sale-for-resale exemption to goods sold out of state, despite Comptroller's contention that such an
interpretation would render it "virtually impossible for him to determine whether the goods are
actually resold" and result in "the loss of much revenue"). We likewise decline to do so here.

 (B) 7-Eleven's Entitlement to Summary Judgment

 In view of the preceding, we hold that 7-Eleven, having shown that its transfer of
store software to its franchisees satisfies the definition of a sale for resale, proved as a matter of law
that its purchase of store software for its franchise stores qualified for the sale-for-resale exemption
under section 151.302 of the tax code. We therefore sustain the portion of 7-Eleven's issue relating
to the store software that was transferred to third-party franchisees outside of Texas.


II. Company Stores

 As to the software that was transferred to 7-Eleven's out-of-state company stores, the
parties joined issue concerning whether 7-Eleven was entitled to claim a sales-tax exemption on the
basis that such software was not used in Texas. 7-Eleven asserts--and the State does
not dispute--that because some of the Canmax store software was purchased to be resold to its
out-of-state franchisees, 7-Eleven was entitled to initially put all of the software into a "tax-free
inventory." (14) Accordingly, 7-Eleven argues, it could later remove the software that it intended to
transfer to its out-of-state company stores without having to pay Texas sales tax on those items,
based on its interpretation of Comptroller rule 3.285. Rule 3.285 provides:


When an item is removed from a valid tax-free inventory for use in Texas, Texas
sales tax is due. Texas sales tax is not due on items removed from a valid tax-free
inventory for use outside the state. When an item purchased under a resale certificate
is used for any purpose other than retention, demonstration, or display, the purchaser
is liable for sales tax based on the fair market rental value of the item for the period
of time used. 



34 Tex. Admin. Code § 3.285(e)(1) (2009) (Tex. Comptroller of Pub. Accounts, Resale Certificate;
Sale for Resale) (emphasis added). Therefore, 7-Eleven asserts that the determinative issue with
respect to the copies of the store software that were transferred to its company stores is whether the
software was "used" in Texas, as "use" is defined in section 151.011 of the tax code. For software
that was installed in its company stores in Texas, 7-Eleven concedes that it owes sales tax. As to the
software that was transferred to its out-of-state company stores, however, 7-Eleven argues that no
sales tax is due because there was no use in Texas.

 In general, "use" refers to "the exercise of a right or power incidental to the ownership
of tangible personal property over tangible personal property." See Tex. Tax Code Ann.
§ 151.011(a). Use does not include "the exercise of a right or power over or the keeping or retaining
of tangible personal property for the purpose of transporting the property outside the state for use
solely outside the state." Id. § 151.011(f). It is on this exclusion from the definition of use that
7-Eleven relies in asserting that it did not use the store software in Texas when it removed the store
software from its tax-free inventory and transported it to its company stores outside of Texas.

 (A) The State's Entitlement to Summary Judgment

 The State sought summary judgment on the basis that 7-Eleven was not entitled to
craft "a sales-tax exemption" from section 151.001(f), a statute that is "definitional" and "solely
applicable to the use tax--not the sales tax." In the State's view, it is not necessary to determine
whether the taxpayer makes a use of the property in Texas; so long as the taxpayer purchases the
property from a Texas seller and takes possession of the property in Texas, sales tax is due. "Use
tax is not applicable if the purchaser paid sales tax to a Texas retailer or owes sales tax to a Texas
retailer who failed to collect it." See 34 Tex. Admin. Code § 3.346(c)(2) (2009) (Tex. Comptroller
of Pub. Accounts, Use Tax); see also Tex. Comptroller of Pub. Accounts, STAR Document
No. 7712L0100A02 (effective Dec. 1, 1977) ("When a sale is consummated between a Texas seller
and his customer and the customer takes possession of the items in Texas, the transaction is subject
to sales tax; not use tax."). According to the State, the Comptroller's understanding that the
definition of "use" is immaterial to whether sales tax is due represents a long-standing, uniformly
enforced Comptroller policy that should be entitled to deference by this Court. See Sergeant Enters.,
Inc. v. Strayhorn, 112 S.W.3d 241, 250-51 (Tex. App.--Austin 2003, no pet.) ("The consistent
construction by an administrative agency charged with effectuating the policy of an enactment carries
very considerable weight." (quoting Felix Frankfurter, Some Reflections on the Reading of Statutes,
47 Colum. L. Rev. 527, 543 (1947)).

 We agree with the State that the issue in this case is whether, upon removing the
software intended for its company stores from its tax-free inventory, 7-Eleven owed sales tax--not
use tax--on the items. See 34 Tex. Admin. Code § 3.285 (providing that when property is removed
from tax-free inventory for use in Texas, Texas sales tax is due). But, as we explain more fully
below, the definition of "use" is material insofar as the plain language of the Comptroller's own rule
requires a determination of whether the software was "used" in Texas. See id. Summary judgment
in favor of the State was therefore improper on the basis that section 151.011(f) of the tax code does
not apply to the Canmax software delivered to out-of-state company stores.

 As an "alternative" basis for summary judgment, the State argued that 7-Eleven
"ha[d] not presented any evidence to show that the software was transported 'outside the state for
use solely outside the state.'" The State further urged that 7-Eleven did not conclusively prove that
it established a valid, tax-free inventory from which it could remove software for transfer and use
out-of-state, noting that 7-Eleven is required by law to keep records "in the form of receipts, shipping
manifests, invoices, and other pertinent papers that substantiate each claimed deduction
or exclusion," see Tex. Tax Code Ann. § 151.025(a)(3), and that the record contains no
such documentation.

 The "alternative" grounds raised in the State's motion are not proper bases for a rule
166a(c) summary judgment. "When both parties move for summary judgment, each party must carry
its own burden and neither can prevail due to the other's failure to meet its burden." Tribble
& Stephens Co. v. RGM Constructors, L.P., 154 S.W.3d 639, 649 (Tex. App.--Houston [14th Dist.]
2004, pet. denied) (citing W.H.V., Inc. v. Associates Hous. Fin., LLC, 43 S.W.3d 83, 87-88
(Tex. App.--Dallas 2001, pet. denied) (emphasis added). Accordingly, if 7-Eleven failed to
establish as a matter of law that it was entitled to a sales-tax exemption for the software that it
transferred to its out-of-state company stores, that did not, ipso facto, entitle the State to summary
judgment. See id. at 650.

 (B) 7-Eleven's Entitlement to Summary Judgment

 As discussed above, Comptroller rule 3.285 provides that "Texas sales tax is not due
on items removed from a valid tax-free inventory for use outside the state." 34 Tex. Admin. Code
§ 3.285(e)(1). 7-Eleven maintains, and we agree, that whether property is removed for "use" outside
the state implicates the statutory definition of "use" found in section 151.011(f) of the tax code. 
Under that definition, any copies of the store software over which 7-Eleven exercised control solely
for the purpose of transport out-of-state were not "used" in Texas. See Tex. Tax Code Ann.
§ 151.011(f). Accordingly, to be entitled to summary judgment on this issue, 7-Eleven had to
conclusively prove that when it removed the software destined for its out-of-state company stores
from its tax-free inventory, it did not exercise a right or power over, keep, or retain the software for
any purpose other than to transport it "outside the state for use solely outside the state." See id.

 7-Eleven asserts that it met this burden, having produced uncontroverted evidence
that the store software was installed in 1,742 out-of-state company stores in Texas; therefore, they
argue, "proof of the number and type of stores and their locations outside the State of Texas proved
the number and location of store software copies that were used out-of-state." 7-Eleven further
argues that the State failed to produce contraverting evidence showing that any of the store software
transported to 7-Eleven's out-of-state company stores was used in Texas.

 We disagree with 7-Eleven that the mere fact that the store software was eventually
installed in 1,742 out-of-state company stores proves as a matter of law that such software was never
used in Texas. The record contains no evidence regarding what 7-Eleven did with the software
during the intervening period of time after it was removed from 7-Eleven's tax-free inventory and
before it was installed in the out-of-state company stores. Rule 3.285 suggests that tax liability
accrues for the period of time that items taken from a tax-free inventory are used "for any purpose
other than retention, demonstration, or display" while the items are being held for transfer or resale
as an integral part of a taxable service. (15) The record contains scant evidence as to what was done
with the store software after 7-Eleven took delivery of it and how it was actually transferred to the
stores. The attorneys for the parties indicated in their briefs and during oral argument that copies of
the store software were made, either by 7-Eleven or at 7-Eleven's direction, in Texas and installed
on computers in Texas, and that these computers were then shipped to the out-of-state company
stores. According to the Comptroller, "use" occurred at the moment that the software was installed
on computers in Texas, regardless of whether the computers loaded with the store software were
intended to be shipped out of state to be "used" by the out-of-state store operators. But the record
does not conclusively prove either use or absence of use in Texas.

 We will not speculate as to how 7-Eleven might have used the original gold master
of the store software or how it disseminated the store software to its out-of-state company stores in
an effort to determine whether such conduct constitutes "use" for purposes of rule 3.285. To be
entitled to summary judgment, 7-Eleven had the burden to prove as a matter of law that it did not
use the store software in Texas when it removed the software from its tax-free inventory to be
transferred to its out-of-state company stores. We conclude that the present summary-judgment
record does not meet this burden. Because the summary-judgment record does not conclusively
establish that the store software for the out-of-state company stores was used in Texas or that it was
not used in Texas, we hold that neither party was entitled to summary judgment on this issue. We
overrule 7-Eleven's issue in part as to the store software that was transferred to its out-of-state
company stores.


CONCLUSION

 We reverse the trial court's summary judgment in favor of the State. As to the tax
assessed on 7-Eleven's purchase of Canmax store software for resale and delivery to its franchise
stores, we render judgment that 7-Eleven is entitled to a sales-tax refund of that amount, plus
penalties and interest assessed as authorized by the tax code. As to the sales tax assessed on
7-Eleven's purchase of store software for its out-of-state company stores, we remand that portion
of the cause to the trial court for further proceedings consistent with this opinion.





 

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson

Reversed and Rendered in Part; Reversed and Remanded in Part

Filed: August 31, 2009
1. Hanson testified:


All the Canmax software did was automate the capture of data that was already being
captured manually. So, like, for instance, we've spoken about the sales. So prior to
the Canmax software, the stores would fill out a piece of paper called a cash report
and send that piece of paper to an accounting office, and the accounting office would
take that piece of paper and key that data directly into our mainframe computer. The
Canmax software allowed the store operator--instead of filling out a piece of paper,
he filled out a computer screen, if you will. So the store operator keyed the data
directly into a computer, a computer that resided at the store, and then a host
computer would poll that computer once a day and extract that data out of it and then
upload it to this mainframe.
2. Naumann testified that Canmax developed only the Phase 2B store software. An entirely
different company developed the Phase 2B host software.
3. As the parties explained during oral argument, the Comptroller separately assessed sales
tax on the host software. 7-Eleven has challenged that assessment in a separate suit unrelated to
this appeal.
4. Hanson calculated these amounts based on the Comptroller's auditor's determination that
the fair market value of the licensing fee for all of the store software was $3,628,230. From that
figure, Hanson calculated "the fair market value of individual copies of the software" by dividing
"the licensing fee attributed to the store software by the total number of store copies made." The
286 copies sent to company stores in Texas, which 7-Eleven conceded would be taxable, represented
$208,620 of the total fair market value, while the 1,742 out-of-state company stores and
2,946 franchise stores represented $1,270,683 and $2,148,928 respectively. Based on these values,
7-Eleven asserted that it was entitled to a refund of $104,831 on the copies of the software sent to
out-of-state company stores and $177,287 on the copies sent to franchise stores, resulting in a total
refund sought of $282,118.
5. 7-Eleven argues that the issue is whether the software transferred to its company stores was
subject to use tax rather than sales tax. While 7-Eleven concedes that the store software that it
installed in its company stores in Texas was subject to Texas use tax, it argues that no use tax was
owed on the store software that was shipped to company stores outside of Texas because that
software was never "used" in Texas.
6. "Tangible personal property" is defined as "personal property that can be seen, weighed,
measured, felt, or touched or that is perceptible to the senses in any other manner," and, "for the
purposes of this chapter, the term includes a computer program." Tex. Tax Code Ann. § 151.009
(West 2008). It is undisputed that the Canmax store software is tangible personal property under this
definition.
7. More precisely, however, the evidence shows that many of the benefits 7-Eleven received
were from its own use of the host software in conjunction with the franchisees' use of the store
software. As Hanson testified, the Canmax software functioned by having the store operator key
"data directly into a computer, a computer that resided at the store, and then a host computer would
poll that computer once a day and extract that data out of it and then upload it to this mainframe."


 While it is clear from the summary-judgment evidence that the store software and the host
software functioned in concert with one another, the record reveals that the reports and other
processes that the State cites as evidence of a direct benefit to 7-Eleven were actually generated by
the host software--a distinct product that was assessed a separate sales tax (which, as the parties
acknowledged during oral argument, is being challenged in a separate proceeding). It is therefore
unclear why the State, having separately valued and taxed the portions of the licensing fee
attributable to the store software and the host software, appears to conflate the two products, citing
evidence in its brief showing how 7-Eleven used the host software for its own benefit as support for
its argument that the store software was actually purchased for 7-Eleven's own use.
8. In its reply brief, 7-Eleven acknowledges that it benefited "from all the goods and services
that it transferred to the franchisees, including the computers, store furniture, the trademarks, the
consultations, the data processing, and other items. All of these items tended to increase franchise
sales, thereby increasing the fees to 7-Eleven."
9. Accordingly, we also reject the State's assertion that the sale-for-resale definition is not met
because the stores themselves were capable of generating their own reports using the store software. 
The record does not support the State's argument that "the Stores are the ones actually doing the data
processing."
10. Likewise, we disagree that 7-Eleven was required to produce evidence "to show what
percentage of the development charge was for Phase 1, pre-POS, or Phase 2B software" in order to
be entitled to summary judgment, given that all phases of the store software--not just Phase 1--are
properly seen as integral to the performance of data-processing services.
11. "Scouting service is the timely procuring of statistical data on oil and gas wells, necessary
to keep oil operators informed of developments in their industry." Williams & Lee Scouting Serv.
Inc. v. Calvert, 452 S.W.2d 789, 790 (Tex. Civ. App.--Austin 1970, writ ref'd).
12. We note that the Comptroller has argued in previous administrative hearings that, because
the essence-of-the-transaction test was developed prior to the imposition of the sales tax on services,
it is not applicable in a case involving taxable services. See Comptroller Decision No. 30,394
(Oct. 28, 1997).
13. Even if the test were applicable in these circumstances, we disagree with the State's
assertion that 7-Eleven's alleged purpose in acquiring the store software from Canmax is material
to the inquiry regarding the taxability of the software that 7-Eleven transferred to its franchisees. 
The essence-of-the-transaction test is intended to determine the essence of what the purchaser
received. See Sharp v. Direct Res. for Print, Inc., 910 S.W.2d 535, 538 (Tex. App.--Austin 1995,
writ denied) (citing Statistical Tabulating, 549 S.W.2d at 169). Thus, in order to determine the
essence of the transaction between 7-Eleven and its franchisees, we must consider from the
franchisees' perspective whether taxable data-processing services were rendered. As discussed
previously, the evidence conclusively establishes that such services enabled the franchisees
to use the store software to transmit electronic data to 7-Eleven, where it was processed. The
essence-of-the-transaction doctrine, even if applicable, would not support the State's position.
14. The Comptroller's tax-policy division expert, Nancy Prosser, testified that the
Comptroller, as a matter of practice, has interpreted the sale-for-resale statute to require that a vendor
intend to sell or transfer at least some of the items that it purchased for its tax-free inventory, but it
did not necessarily have to know that it would sell or transfer every single item that it put into its
tax-free inventory. See also, e.g., Tex. Comptroller of Pub. Accounts, STAR Document
No. 8908L0952E01 (effective Aug. 8, 1989) ("A tax-free inventory of out-of-state purchases may
be kept if separate records are maintained on the out-of-state purchases and it is not known whether
the items purchased will be used in Texas.").
15. Although the rule refers specifically to items purchased under a resale certificate and the
record here does not indicate that 7-Eleven used a resale certificate in its initial purchase of the
software from Canmax, neither party argues that rule 3.285 does not apply to the sale at issue in
this case.