# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00391-CV

---

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas, Appellants**

**v.**

**Black, Mann, and Graham, L.L.P., Appellee**

---

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-001725, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

This appeal arises out of a suit for judicial review of an assessment of sales tax levied by the Comptroller of Public Accounts. *See* Tex. Tax Code § 112.052 (establishing cause of action). Black, Mann, and Graham, L.L.P. (BMG) contends that the Comptroller improperly classified the services BMG purchased as "data processing services" subject to sales tax rather than nontaxable legal services. *See id.* § 151.0101(a)(12) (listing data-processing services as taxable service). Following a bench trial, the district court rendered judgment for BMG and ordered the Comptroller to refund $200,700.46 in sales tax plus statutorily required interest. We will reverse and render judgment that BMG take nothing.

# BACKGROUND

BMG is a Texas law firm that offers several services in connection with residential mortgages. Thomas Black, the firm's managing partner, testified that lending institutions employ BMG to prepare loan packages, which consists of all legal documents necessary to execute the transaction.[1] A typical loan package includes a promissory note, deed of trust, and disclosures required by state and federal law, among other documents, and is "maybe a hundred pages."

Black testified that BMG prepares loan packages in two ways. BMG can generate the package itself using software that interfaces with the client's loan origination system (LOS). An LOS is a database maintained by a lending institution that stores the data provided by loan applicants. BMG's software uses that data to generate a loan package. The other way BMG prepares loan packages is to review documents generated by others. At all relevant times, BMG had contracts with International Document Solutions (IDS) and LenderLive (collectively, Vendors) to prepare loan packages.

Black explained how the process works from the time a lender first employs BMG. Programmers working for ITS or LenderLive create an interface between the lender's LOS and each company's document-generation software. Each company's programmers then create a module that enables the software to take a data file from the LOS and map the data onto all the documents that make up the loan package. During this process, the programmers work with legal-compliance experts to ensure the software chooses all the legally required forms and enters all the necessary information in the correct places on the forms. Black estimated that it

---

[1] We take the following factual description from Black's testimony and BMG's contracts with IDS and LenderLive, which were admitted at trial.

2

"usually takes a month to two months to get a lender completely set up on the system." Once the setup process is complete, each company's software can automatically generate a loan package. The package is then sent to BMG, where it is reviewed by a paralegal under the supervision of one of the firm's attorneys. If the loan package complies with applicable law and satisfies BMG's other criteria, the firm purchases the package and resells it to the lender. If it is not compliant, BMG rejects the package and informs the vendor of the problems. The vendor then generates another package with the necessary changes. BMG only pays for a package that meets its requirements, including legal compliance. In the month before trial, BMG purchased approximately 11,500 packages.

The Comptroller audited BMG for the period of October 1, 2014 to March 31, 2018 (Audit Period) and issued an assessment of $160,154.98 in sales tax, including $145,519.56 for purchases of loan packages from the Vendors. BMG paid the entire assessment plus interest under protest and sued for judicial review.[2] *See* Tex. Tax Code § 112.051 (requiring prepayment as predicate to tax protest suit). BMG contested only the Comptroller's determination that BMG had purchased taxable data-processing services from the Vendors.[3] *See id.* § 151.0035 (defining "data processing services"); 34 Tex. Admin. Code § 3.330(a)(1) (further defining data processing).

BMG subsequently self-assessed $38,485.98 in sales tax for its purchases of loan packages for the period between April 1, 2018, and March 31, 2019 (Subsequent Period). BMG paid those taxes under protest and amended its pleadings to include that payment. *See* Tex. Tax

---

[2] Chapter 112 requires a protest plaintiff to sue the Comptroller and the Attorney General. *See* Tex. Tax Code § 112.053(a). We refer to them collectively as the Comptroller.

[3] BMG did not contest the remainder of the assessment for the Audit Period.

3

Code § 112.056(a) (providing that plaintiff in tax protest suit "shall pay additional taxes when due under protest after the filing of a suit authorized by this subchapter and before the trial" and "may amend the original petition to include all additional taxes paid under protest"). The Comptroller filed a plea to the jurisdiction arguing that sovereign immunity bars BMG's claim for the Subsequent Period because BMG failed to comply with Section 112.056.

The district court heard arguments on the plea at the beginning of the scheduled trial on the merits. After taking the plea under advisement, the district court heard testimony from Black and Grace Maher, an employee of BMG who is responsible for handling the firm's taxes, and admitted documentary evidence, including BMG's contracts with each of the vendors. The district court subsequently signed a judgment denying the plea to the jurisdiction and rendering judgment that BMG is entitled to a refund of $200,700.46 in sales taxes plus interest. At the Comptroller's request, the district court entered findings of fact and conclusions of law. This appeal ensued.

## PLEA TO THE JURISDICTION

We first consider whether the district court correctly denied the Comptroller's plea to the jurisdiction asserting that sovereign immunity bars BMG's claim for a refund for the Subsequent Period before turning to the merits of the Comptroller's challenge to the district court's judgment that BMG is entitled to a refund.

"Sovereign immunity is the 'well-established doctrine that no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent.'" *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 731 (Tex. 2020) (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015)). Immunity from suit implicates a court's subject

4

matter jurisdiction and is properly asserted in a plea to the jurisdiction.[4] *Id.* When a government entity challenges jurisdiction on immunity grounds, the plaintiff has the burden to "affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Texley Inc. v. Hegar*, 613 S.W.3d 322, 326 (Tex. App.—Austin 2020, no pet.) (citing *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 927 (Tex. 2015) (per curiam)). In determining whether the plaintiff has met that burden, we liberally construe the pleadings and look to the plaintiff's intent. *Texas Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020). We review the disposition of a plea to the jurisdiction de novo because jurisdiction is a question of law. *Nettles*, 606 S.W.3d at 731.

The jurisdictional issue here involves questions of statutory construction, which we also review de novo. *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647 (Tex. 2020). In construing a statute, we seek to "ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *City of Conroe v. San Jacinto River Auth.*, 602 S.W.3d 444, 451 (Tex. 2020) (citing *City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 580 (Tex. 2018)). "We do not construe statutory provisions in isolation" but "consider the context and framework of the entire statute and construe it as a whole." *Id.* (citing *Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019)). Moreover, we "presume the Legislature chose statutory language deliberately and purposefully" while purposefully omitting words not chosen. *Hogan v. Zoanni*, 627 S.W.3d 163, 169 (Tex. 2021). "Where statutory text is clear, that text is determinative of legislative intent unless the plain meaning of the statute's words would produce

---

[4] We address the Comptroller's plea to the jurisdiction first because subject-matter jurisdiction "is never presumed and cannot be waived." *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993).

an absurd result." *Texas Workforce Comm'n v. Wichita County*, 548 S.W.3d 489, 492 (Tex. 2018) (citing *Texas Mut. Ins. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012)).

In Chapter 112, the Legislature waived the State's sovereign immunity as to three types of tax challenges—protests, refunds, and redeterminations. *See* Tex. Tax Code §§ 112.051, .151, .201; *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 750 (Tex. 2020). A taxpayer intending to bring a protest suit must "pay the amount claimed by the state" and submit a timely written protest that states "fully and in detail each reason for recovering the payment." Tex. Tax Code § 112.051(a)–(c). If the taxpayer complies with these requirements, Section 112.051 waives the State's sovereign immunity from suit to recover that payment. *See id.* § 112.052(a) ("A person may bring suit against the state to recover a tax required to be paid to the state if the person has first paid the tax under protest as required by Section 112.051."); *In re Nestle USA, Inc.*, 359 S.W.3d 207, 211–12 (Tex. 2012) (orig. proceeding) (holding that chapter 112 waives sovereign immunity from suit if taxpayer complies with protest payment requirement).

Chapter 112 also allows the taxpayer to invoke the court's jurisdiction over taxes that become due after filing suit:

> (a) A petitioner shall pay additional taxes when due under protest after the filing of a suit authorized by this subchapter and before the trial. The petitioner may amend the original petition to include all additional taxes paid under protest before five days before the day the suit is set for a hearing or may elect to file a separate suit. No such election shall prevent the court from exercising its power to consolidate or sever suits and claims under the Texas Rules of Civil Procedure.
>
> (b) [Repealed]
>
> (c) This section applies to additional taxes paid under protest only if a written protest is filed with the additional taxes and the protest states the same reason for contending the payment of taxes that was stated in the original protest.

6

Tex. Tax Code § 112.056. Under this section, a petitioner who complies with Section 112.051's prerequisites and files suit must pay additional taxes "when due under protest" and may either amend its pleadings to include the payment or file a separate suit. *See id.* § 112.056(a). The election is only available if the protest letter states the same grounds as the original protest letter. *See id.* § 112.056(c). The Comptroller argues that BMG failed to pay the taxes for the Subsequent Period "under protest." Although there is no dispute that BMG paid the taxes accompanied by a protest letter, the Comptroller argues that payment under protest is a "term of art that refers back to Section 112.051's definition of a protest payment." The Comptroller argues that BMG could not satisfy Section 112.051's requirement that the taxpayer "pay the amount claimed by the state," *id.* § 112.051(a), because the Comptroller never claimed a specific amount of taxes for the Subsequent Period; rather, BMG self-assessed $38,485.98 in sales taxes. BMG responds that nothing in Section 112.056 requires the taxpayer to satisfy Section 112.051.

We agree with BMG. The Comptroller's interpretation ignores significant differences between Section 112.051 and .056, which operate independently. Section 112.051 provides:

> If a person who is required to pay a tax imposed by this title or collected by the comptroller under any law . . . contends that the tax is unlawful or that the public official charged with the duty of collecting the tax may not legally demand or collect the tax, *the person shall pay the amount claimed by the state*, and if the person intends to bring suit under this subchapter, the person must submit with the payment a protest.

*Id.* § 112.051(a) (emphasis added). The requirement to "pay the amount claimed by the state" in this subsection presupposes that there has been "some sort of affirmative claim by the state for a specific amount of [] taxes." *1st Glob., Inc., v. Hegar*, No. 03-19-00740-CV, 2021 WL 5022390, at *3 (Tex. App.—Austin Oct. 29, 2021, no pet.) (mem. op.) (rejecting taxpayer's contention that

7

self-assessment of its franchise tax liability could constitute "the amount claimed by the state"). Section 112.056 does not employ similar language referring to an "amount claimed by the state" but simply directs the taxpayer to "pay additional taxes *when due* under protest." Tex. Tax Code § 112.056 (emphasis added). Under the Tax Code, taxes are "due and payable" to the Comptroller on a certain date without need for an affirmative demand. *See id.* § 151.401(a) (providing that sales and use taxes "are due and payable to the comptroller on or before the 20th day of the month following the end of each calendar month unless a taxpayer qualifies as a quarterly filer under Subsection (b) of this section or unless the taxpayer prepays the tax on a quarterly basis"). We presume that the legislature was aware of this meaning and chose to employ it in Section 112.056 rather than require the taxpayer to pay a specific amount demanded by the Comptroller, as subsection 112.051(a) unambiguously requires. *See Hogan*, 627 S.W.3d at 169; *Bush*, 601 S.W.3d at 647 ("[W]e presume the Legislature enacted the statute 'with complete knowledge of the existing law and with reference to it." (citing *In re Bridgestone Ams. Tire Operations, LLC*, 459 S.W.3d 565, 572 (Tex. 2015) (orig. proceeding))).

This interpretation is consistent with Section 112.056's role in the statutory scheme. Section 112.056 applies only "after the filing of a suit authorized by this subchapter"—that is, after the taxpayer has complied with Section 112.051's requirements to waive sovereign immunity. *Id.* § 112.056(a). It applies only if the additional taxes are paid under protest and the protest "states the same reason for contending the payment of taxes that was stated in the original protest." *Id.* § 112.056(c). Because the issues to be determined in a protest suit "are limited to those arising from the reasons expressed in the written protest as originally filed," *see id.* § 112.053(b), section 112.056 precludes protest plaintiffs from adding new issues to the pending suit. Requiring an affirmative demand from the Comptroller would serve no purpose when the

8

Comptroller's right to demand those very taxes is already at issue in the pending suit. *Cf. JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 488 (Tex. 2019) ("Courts 'do not lightly presume that the Legislature may have done a useless act.'" (quoting *Liberty Mut. Ins. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485 (Tex. 1998))).

The Comptroller responds that its interpretation of Section 112.056 is consistent with the requirement that litigants exhaust administrative remedies. When the legislature "has granted an agency exclusive jurisdiction to adjudicate a disputed issue, the agency has the sole authority to make an initial determination regarding that issue, and a trial court lacks jurisdiction until a party has exhausted administrative remedies." *In re CenterPoint Energy Hous. Elec., LLC*, 629 S.W.3d 149, 154 (Tex. 2021) (orig. proceeding). Citing a decision from one of our sister courts, the Comptroller argues that it has "exclusive jurisdiction over tax disputes." *See Burgess v. Gallery Model Homes, Inc.*, 101 S.W.3d 550, 558 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). However, *Burgess* involved a tax refund suit. *Id.* at 553; *see generally* Tex. Tax Code §§ 112.151–.156 ("Suit for Tax Refund"). The legislature has "created two distinct and exclusive remedies for tax refund suits and tax protest suits—each with different procedural requirements." *Hegar v. Mahindra USA, Inc.*, No. 03-18-00126-CV, 2020 WL 962415, at *5 (Tex. App.—Austin Feb. 28, 2020, no pet.) (mem. op.) (citing *Local Neon Co. v. Strayhorn*, No. 03-04-00261-CV, 2005 WL 1412171, at *3 (Tex. App.—Austin June 16, 2005, no pet.) (mem. op.)). Refund suits require a taxpayer to submit a refund claim to the Comptroller and obtain a decision as a prerequisite to establishing a waiver of sovereign immunity. *See* Tex. Tax Code § 112.151(a) (requiring compliance with administrative procedures laid out in sections 111.104 and 111.105); *Combs v. Chevron, Inc.*, 319 S.W.3d 836, 844 (Tex. App.—Austin 2010, pet. denied) (stating that compliance with sections 111.104 and 111.105 is jurisdictional

9

prerequisite).  There is no similar requirement to establish a waiver of immunity from a protest suit.  *See* Tex. Tax Code § 112.052(a) ("A person may bring suit against the state to recover a tax required to be paid to the state if the person has first paid the tax under protest as required by Section 112.051."); *Hegar*, 2020 WL 962415, at *5 (explaining that in contrast to refund suit, to bring a protest suit "a person must pay the amount assessed, submit with the tax payment a protest letter," and timely file suit (citing *Local Neon Co.*, 2005 WL 1412171, at *3)).  There is no statutory basis for the Comptroller's argument that it has exclusive authority to make an initial determination in a protest suit.  *See CenterPoint Energy Hous. Elec.*, 629 S.W.3d at 154 (explaining that agencies "may exercise only powers conferred in clear and express statutory language" and do not enjoy presumption of jurisdiction afforded district courts).  Thus, the requirement that litigants exhaust administrative remedies does not require us to alter our interpretation of Section 112.056.[5]

In sum, nothing in Section 112.056 requires the taxpayer to comply with Section 112.051 when paying additional taxes under protest, and "[w]e have no right to engraft upon the statute any conditions or provisions not placed there by the legislature." *In re Geomet Recycling*

---

[5] The Comptroller also argues that BMG's claim for the subsequent period is not ripe. "Ripeness, which requires a plaintiff to have a concrete injury before bringing a claim, is a 'threshold issue that implicates subject matter jurisdiction.'" *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 706 (Tex. 2021) (quoting *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998)).  In determining whether a case is ripe, "we consider whether, at the time a lawsuit is filed, the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Id.* (citing *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–52 (Tex. 2000)).  The Comptroller argues that BMG's claim for the Subsequent Period is not ripe because "[s]peculation as to the position the Comptroller may take regarding the Subsequent Period does not present a concrete injury or a justiciable claim."  However, the Comptroller has already taken the position that BMG owes sales tax on its purchases of loan packages and there is no dispute that these are additional payments of the same disputed taxes.  Under these circumstances, we conclude BMG's claim for the Subsequent Period is ripe.

*LLC*, 578 S.W.3d 82, 87 (Tex. 2019) (orig. proceeding) (citing *Iliff v. Iliff*, 339 S.W.3d 74, 80–81 (Tex. 2011)). There being no dispute that BMG paid the additional taxes accompanied by a protest letter stating the same grounds as the original letter, the district court correctly determined that it possessed jurisdiction over BMG's claims for the Subsequent Period.

## DATA-PROCESSING SERVICES

We now turn to the Comptroller's challenge to the merits of the district court's judgment. The State of Texas imposes sales tax on data-processing services, defined as "word processing, data entry, data retrieval, data search, information compilation, payroll and business accounting data production, and other computerized data and information storage or manipulation." Tex. Tax Code § 151.0035(a)(1). The district court concluded that the Vendors "do not provide data processing services" but rather provide a nontaxable professional service that is "facilitated by use of software and computers."[6] More specifically, the Vendors provide "the services of paralegals and legal compliance and mortgage experts to deliver a compliant loan package."

The Comptroller argues that there is legally and factually insufficient evidence to support several findings of fact and that the district court misconstrued applicable statutes and regulations to reach this conclusion. We address each of these arguments in turn.

---

[6] Although the district court labeled this item a finding of fact, we treat it as a conclusion of law. *See Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 640 (Tex. App.—Austin 2012, no pet.) (explaining that "a trial court's designation of items as findings of fact or conclusions of law is not controlling on appeal" (citing *Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607, 608 n.1 (Tex. 1979)).

11

**Standards of Review**

We review the trial court's conclusions of law de novo and its findings of fact for sufficiency of the evidence. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). "A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Texas Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019).

A party challenging the legal sufficiency of an adverse finding on which it did not bear the burden of proof at trial, as the Comptroller does here, must demonstrate that no evidence supports the finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We will sustain a legal sufficiency challenge if there is a complete lack of evidence of a vital fact, we are barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, there is no more than a scintilla of evidence offered to prove a vital fact, or the record conclusively establishes the opposite of the vital fact. *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 783 (Tex. 2020). In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Id.*

On the other hand, in reviewing a finding for factual sufficiency, "we examine the entire record, considering the evidence in favor of and contrary to the challenged finding." *Wichita County v. Environmental Eng'g & Geotechnics, Inc.*, 576 S.W.3d 851, 862 (Tex. App.—Austin 2019, no pet.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). To prevail on a factual-sufficiency challenge, the Comptroller must "demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Id.*

12

**Sufficiency of the Evidence[7]**

The Comptroller challenges the following findings of fact:

19. The Vendors function similarly to outsourced paralegals, under BMG's supervision and ultimate sign-off.

21. Although the Vendors are not engaged in the practice of law in Texas, their services are provided only to licensed Texas attorneys and the only marketable value of their services is as an outsourced portion of BMG's legal practice.

26. Once the information is entered into the LOS, the Vendors spend approximately 30 to 60 days building custom modules, specific for each mortgage lender.

29. Mapping is performed by the Vendors' programmers, under the supervision of legal compliance and mortgage experts.

31. The Vendors employ legal compliance and mortgage experts to constantly review and respond to regulatory changes and ensure the loan packages created are compliant.

32. An example of a complex analysis performed by the Vendors' system and legal compliance and mortgage experts is a Truth in Lending Disclosure, which must be included in a compliant loan package. One of the elements in the Truth and Lending Disclosure is the complex calculation of the annual percentage rate.

37. If BMG finds an error in the loan package, the Vendors are notified, the error is corrected, and a new loan package is sent to BMG.

38. BMG does not correct any errors in the loan package.

39. BMG only pays for a compliant loan package.

41. The legal compliance and mortgage experts are the "secret sauce" of the Vendors' service. Without the legal compliance and mortgage experts,

---

[7] The Comptroller also challenges findings 2, 10, 11, and 12, which concern BMG's compliance with the statutory prerequisites for suit. The Comptroller challenges these findings on the basis that the district court lacked jurisdiction over the Subsequent Period. Because we have concluded the district court possessed jurisdiction over BMG's claim to recover taxes for the Subsequent Period, we overrule these challenges.

13

ensuring a 50-state compliant loan package, BMG and the mortgage lenders would not use the Vendors.

44. BMG is not charged for the computers and software used by the Vendors to facilitate the creation of a compliant loan package.

With respect to findings 19 and 21, the Comptroller argues that there is no evidence that the Vendors function as paralegals or that their services are "an outsourced portion of BMG's legal practice." BMG responds that the record supports that the Vendors function similarly to "BMG's own paralegals, who could perform the same work." BMG argues that this is important because services that would not be taxable when provided by BMG's employees "do not become taxable merely because BMG chooses to outsource them to the Vendors." However, a "service performed by an employee for the employee's employer in the regular course of business, within the scope of the employee's duties, and for which the employee is paid regular wages or salary" is exempt from sales tax. *See* Tex. Tax Code § 151.3503(a)(1). Whether BMG's paralegals perform similar work when BMG prepares a loan package in-house is not relevant to the ultimate question of whether the Vendors provide taxable data-processing services. We therefore need not address whether the evidence supports these findings.[8] *See* Tex. R. App. P. 47.1; *Instill Corp. v. Hegar*, No. 03-18-00374-CV, 2019 WL 2308592, at *3 (Tex. App.—Austin May 31, 2019, pet. denied) (mem. op.) (declining to evaluate certain facts after characterizing those facts as irrelevant to contested conclusions).

With respect to Finding 44, the Comptroller argues that there is no evidence that BMG is not charged for software because its contracts with the Vendors state only that BMG is not charged for software "updates," not that it is not charged for computers or software. We

---

[8] To the extent the statement in Finding 21 that "the only marketable value of [the Vendors'] services is as an outsourced portion of BMG's legal practice" means that the Vendors provide legal services, it is a conclusion of law. We address that issue below.

14

need not address this issue because it is not material to our conclusion below that BMG purchased a taxable service.  *See* Tex. R. App. P. 47.1; *Instill Corp.*, 2019 WL 2308592, at *3.

The Comptroller argues that Finding 37 directly conflicts with Finding 38, which states that "BMG does not correct any errors in the loan package."  Black testified that BMG's employees identify errors in loan packages generated by the Vendors and return the packages to the Vendors for correction.  BMG employees do not themselves make corrections to the loan documents.  This testimony provides a reasonable basis to reconcile the two findings.  *See Bowman v. Stephens*, 569 S.W.3d 210, 224 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (explaining that appellate courts must reconcile apparent conflicts in findings "if there is any reasonable basis to do so").

With respect to Findings 26 and 29, Comptroller argues that there is no evidence that generating a loan package takes approximately thirty to sixty days or that the mapping is performed by the Vendors' programmers.  We agree.  Black testified that the process of creating the interface between the LOS and a vendor's software can take "a month to two months" but he also agreed that the software automatically generates loan packages.  There is no evidence that the actual process of mapping a data file into a vendor's system and using the data to generate a loan package takes up to three months.

With respect to Finding 31, the Comptroller argues that there is no evidence that the Vendors' legal compliance employees "ensure the loan packages created are compliant."  Similarly, the Comptroller argues that no evidence supports Finding 41's statement that the experts "ensur[e]" a compliant loan package.  BMG points to Black's testimony that each vendor's legal-compliance and mortgage experts "work real closely" with the programmers so that the software includes all the legally required forms.  However, he also stressed that BMG—

15

and not the Vendors—independently determines that each package is legally compliant. Black's testimony is consistent with the contracts, each of which provides that the vendor is not responsible for ensuring that each loan package complies with applicable law. There is no evidence that the compliance employees independently determine whether the autogenerated loan packages are compliant. However, the record supports that BMG would not employ either corporation if it did not employ legal experts to assist the programmers in programming the software to generate a package as close as possible to BMG's specifications, including compliance with applicable law.

With respect to Finding 32, the Comptroller argues that there is no evidence that calculating the annual percentage rate is "complex" because it involves "a set formula used for every single document package and [] does not vary." Black testified that the rate is calculated using a formula that does not change "on a file-by-file basis." He explained that the only variable that changes is how many places "to the right of the point that you're going to go with," a decision which is made by the lender. To the extent Finding 32 means that the Vendors' legal-compliance experts perform the calculation for each individual loan package, no evidence supports that finding.

With respect to Finding 39, the Comptroller argues that the record conclusively establishes that BMG only pays for a loan package determined to be compliant. We agree that Black's testimony and the two contracts all establish that BMG does not pay for a loan package until it determines that the package is legally compliant. But we do not construe the finding as saying the contrary.

To summarize, there is no evidence to support the district court's findings that: the process of transferring from an LOS to a vendor's system and generating a loan package

16

takes approximately thirty to sixty days; the Vendors' programmers manually perform this process; or that legal- and mortgage-compliance experts review each generated loan package for legal compliance. The record instead shows that the Vendors autogenerate loan packages which are reviewed by BMG for legal compliance. However, the record supports the finding that BMG would not employ the Vendors without their legal compliance experts. We therefore sustain the Comptroller's challenge to the disputed findings in part and overrule it in part.[9]

**Statutory Classification of the Vendors' Services**

Next, the Comptroller argues that the district court misapplied the governing law to conclude that the Vendors provide "the services of paralegals and legal compliance and mortgage experts to deliver a compliant loan package" rather than data-processing services. More specifically, the Comptroller argues that the record conclusively establishes that the Vendors' services meet the definition of data-processing services. *See* Tex. Tax Code § 151.0035(a)(1). The Comptroller, who has exclusive jurisdiction to interpret the meaning of taxable services, *see id.* § 151.0101(b), has promogulated a rule interpreting "data processing" to mean:

> the processing of information for the purpose of compiling and producing records of transactions, maintaining information, and entering and retrieving information. It specifically includes word processing, payroll and business accounting, and computerized data and information storage or manipulation . . . . Examples of data processing services include entering inventory control data for a company, maintaining records of employee work time, filing payroll tax returns, preparing W-2 forms, and computing and preparing payroll checks. Data processing does not include the use of a computer by a provider of other services when the

---

[9] The Comptroller also challenges Finding 7: "The amount at issue for the compliant loan package services sold by the Vendors for the Audit Period is $162,214.48 ($145,519.56 in sales tax and $16,694.92 in interest thereon)." We do not address this issue because we will conclude that BMG is not entitled to a refund in any amount. *See* Tex. R. App. P. 47.1.

17

computer is used to facilitate the performance of the service or the application of the knowledge of the physical sciences, accounting principles, and tax laws[.]

34 Tex. Admin. Code § 3.330(a)(1) (Tex. Comptroller of Pub. Accounts, Data Processing Services—Definitions).

We start with a threshold dispute over how to determine whether a service constitutes taxable data processing. BMG argues that when read in conjunction, Section 151.0035(a)(1) and Rule 3.330 establish a two-part test to determine if a service is taxable data processing: "first, the service must fall within one of the specifically enumerated activities classified as data processing—the 'activities' prong." Second, "the service must have been purchased for the purpose of compiling and producing records of transactions, maintaining information, and entering and retrieving information—the 'purpose' prong." The Comptroller responds that Rule 3.330 does not create a two-part test and, in the alternative, that the Vendors' services satisfy that test.

We agree with the Comptroller that Rule 3.330 does not create a two-part test to determine whether a service is taxable data processing. "We construe administrative rules, which have the same force as statutes, in the same manner as statutes." *Rodriguez v. Service Lloyds Ins.*, 997 S.W.2d 248, 254 (Tex. 1999). "Unless the rule is ambiguous, we follow the rule's clear language." *Id.* BMG derives the "purpose" prong from the first sentence of Rule 3.330(a)(1), which defines data processing as "the processing of information *for the purpose* of compiling and producing records of transactions, maintaining information, and entering and retrieving information." 34 Tex. Admin. Code § 3.330(a)(1) (emphasis added). BMG argues that the Comptroller deliberately inserted the "for the purpose" language in the first sentence to impose an "essential limitation" on the statutory definition of taxable data processing. Such a

18

limitation is necessary, BMG argues, in an economy where "computers are used in the delivery of virtually every service." In other words, BMG's view is that data-processing services consist of the activities enumerated in the second sentence that are performed "for the purpose of compiling and producing records of transactions, maintaining information, and entering and retrieving information."

BMG's interpretation ignores the relationship between the two sentences. Read in context, *see City of Conroe*, 602 S.W.3d at 451, the first sentence defines data processing as a class of activities while the second defines some, but not all, activities included in that class. *See* 34 Tex. Admin. Code § 3.330(a)(1). That is, taxable data processing consists of "the processing of information" for "the purposes of compiling and producing records of transactions, maintaining information, and entering and retrieving information." *See id.* It includes, but is not limited to, "word processing, payroll and business accounting, and computerized data and information storage or manipulation." *See id.* Nothing limits data processing only to the enumerated activities. Nor does it create a distinct "purpose" prong that must be satisfied in every case. It is only when an activity is not enumerated in Rule 3.330 that we look to whether it constitutes processing information "for the purpose of compiling and producing records of transactions, maintaining information, and entering and retrieving information." *See id.* Regarding BMG's argument that there must be an "essential limitation" on the scope of the rule, Rule 3.330 already provides that taxable data processing does not "does not include the use of a computer by a provider of other services when the computer is used to facilitate the performance of the service." *See id.* Although determining whether this exemption is applicable in a particular case might be said to involve inquiring into the purpose behind an activity, it does not

create an independent "purpose" prong that must be satisfied in every case.[10]  Nothing in Rule 3.330(a) creates a two-pronged test for data processing, and we have no power to rewrite the rule to include an additional requirement that does not appear in the text.[11]  *See Geomet Recycling*, 578 S.W.3d at 87.

We now turn to whether the BMG carried its burden to show that it was entitled to a refund of the taxes paid under protest.  *See U.S. Concrete, Inc. v. Hegar*, 578 S.W.3d 559, 569 (Tex. App.—Austin 2019, pet. denied).  The Comptroller argues the district court erred by concluding that the Vendors do not provide taxable data processing.  BMG responds that the district court's conclusion was correct because the "essence of the transaction" was the conveyance of "compliant loan package" through the "services of paralegals and legal compliance and mortgage experts" and not a data-processing service.  Courts have applied the

---

[10]  To illustrate the two-pronged analysis the statute and rule purportedly require, BMG cites to an unpublished memorandum opinion from our sister court in Houston.  *See generally Hegar v. CheckFree Servs. Corp.*, 14-15-00027-CV, 2016 WL 1576414, at *5 (Tex. App.—Houston [14th Dist.] Apr. 19, 2016, no pet.) (mem. op.).  *CheckFree* involved a dispute between the Comptroller and CheckFree Services, a taxpayer that provided technical support to customers in the financial industry.  *Id.* at *1.  The district court concluded that, based on the undisputed findings of fact, none of the services that CheckFree provided consist of "processing of information for the purpose of compiling and producing records of transactions, maintaining information, [or] entering and retrieving information" or any of the activities listed in the second sentence of the rule.  *Id.* at *5 (citing 34 Tex. Admin. Code § 3.330(a)(1)).  Nothing in our sister court's analysis involves the two-part test described by BMG.  *See generally id.* at *5–6.

[11]  We would reach the same result even if Rule 3.330 were ambiguous.  BMG's argument that Rule 3.330(a)(1) imposes a limitation on the statutory definition of data processing could raise questions about its validity.  *Cf. Hegar v. Ryan, LLC*, No. 03-13-00400-CV, 2015 WL 3393917, at *7 (Tex. App.—Austin May 20, 2015, no pet.) (mem. op.) (explaining that administrative rule is invalid if it "imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions" (citing *Office of Pub. Util. Couns. v. Public Util. Comm'n*, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet. denied))).  Our interpretation harmonizes and gives effect to both Section 151.0035 and Rule 3.330.  *See In re CompleteRx, Ltd.*, 366 S.W.3d 318, 324 (Tex. App.—Tyler 2012, orig. proceeding) (explaining that courts must harmonize rules and statutes if possible).

"essence of the transaction" test "to sales involving a combination of taxable and non-taxable elements to determine whether the transaction is properly subject to sales tax." *Instill Corp.*, 2019 WL 2308592, at *5 (citing *Comptroller of Pub. Accounts v. Austin Multiple Listing Serv., Inc.*, 723 S.W.2d 163, 165 (Tex. App.—Austin 1986, no writ); *First Nat. Bank of Fort Worth v. Bullock*, 584 S.W.2d 548, 550 (Tex. App.—Austin 1979, writ ref'd n.r.e.)). We have described the essence of the transaction as "the ultimate object" of the sale and as "the customer's basic purpose in entering into the transaction." *Id.* (citing *Sharp v. Direct Res. for Print, Inc.*, 910 S.W.2d 535, 538 (Tex. App.—Austin 1995, writ denied)); *see Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 169 (Tex. 1977). This Court applied the essence-of-the-transaction test in *Instill Corp.* to determine whether the district court had misclassified Instill's services as taxable data processing rather than tax-exempt proprietary information services. *Instill Corp.*, 2019 WL 2308592, at *5. We assumed without deciding that the essence-of-the-transaction test was applicable—a point the Comptroller contested—because applying the test resulted in affirming the judgment in the Comptroller's favor. *See id.* at *5-6. Here, the Comptroller cites our analysis in *Instill Corp* favorably but does not explicitly take a position on whether the test is applicable. BMG, on the other hand, argues that Rule 3.330 incorporates the "essence of the transaction" test. Under these circumstances, we will assume without deciding that the "essence of the transaction" test is applicable.

BMG argues that the ultimate purpose in the transactions at issue was the conveyance of "compliant loan package[s]" through the services of "legal compliance and mortgage experts." The Comptroller responds that the contracts with each vendor show that its intent was to purchase data-processing services, while BMG was responsible for ensuring that the autogenerated loan packages were legally compliant. The language of both contracts

21

supports the Comptroller's characterization.  The contract with LenderLive states that BMG is "solely responsible for the legal content" of the loan packages and will provide LenderLive with instructions regarding how to generate a legally compliant loan package.  LenderLive is responsible for generating each loan package according to BMG's instructions.  BMG—and not LenderLive—"approve[s] or disapprove[s] each transaction from a legal perspective in accordance with Texas state law."  Similarly, IDS agrees "to provide documentation packages that contain all the required [documents] . . . for a given loan product" and to map customer data onto those documents.  However, IDS is not responsible for the result of the data mapping and does not guarantee that any loan package "comports with established laws and regulations."  In other words, BMG paid the Vendors to collect and manipulate data and return it according to BMG's instructions.

BMG responds that relying too closely on the contracts ignores the economic realities of the transactions.  Black testified that the firm employs the Vendors because their document-generation systems reliably produce loan packages that meet their specifications, which is the result of the work of the Vendors' legal- and mortgage-compliance experts. Because creating loan packages requires "direct application of knowledge of the law," BMG reasons that it is therefore purchasing legal services rather than taxable data-processing services. Although the record supports that the process of setting up the unique module to generate loan packages for each of BMG's clients involves the application of legal knowledge by the Vendors' employees, BMG and the Vendors were careful to structure their contracts so that BMG did not purchase those services.  We presume the contractual language reflects the parties' intent. *See Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014) (stating that unambiguous contracts "are presumed to reflect the intent of the contracting parties");

22

*Instill Corp.*, 2019 WL 2308592, at *5 (rejecting interpretation of transaction which conflicted with contracts).

We must also consider the legal realities applicable to the transaction. "A contract to do a thing which cannot be performed without violation of the law violates public policy and is void." *Philadelphia Indem. Ins. v. White*, 490 S.W.3d 468, 483 (Tex. 2016). Contracting parties are "presumed to know the law, and are likewise presumed to intend that their agreement shall have legal effect." *Id.* (citing *Texas Emps. Ins. Ass'n v. Tabor*, 283 S.W. 779, 780 (Tex. Comm'n App. 1926 judgm't adopted))). The Comptroller argues that if BMG's interpretation of the transaction—that BMG purchased legal services—is correct, the Vendors could be engaged in the unauthorized practice of law. With exceptions not relevant here, non-lawyers "may not charge or receive, either directly or indirectly, any compensation for all or any part of the preparation of a legal instrument affecting title to real property, including a deed, deed of trust, note, mortgage, and transfer or release of lien." Tex. Gov't Code § 83.001(a), (b)(1). This prohibition "does not prevent an attorney from paying secretarial, paralegal, or other ordinary and reasonable expenses necessarily and actually incurred by the attorney for the preparation of legal instruments." *Id.* § 83.002. BMG argues that this exception enables the Vendors to provide legal services—not data processing services—without engaging in the unauthorized practice of law. Thus, BMG reasons, there is no reason to interpret the transaction to avoid these concerns. Even if BMG were correct that BMG could enter a transaction to purchase legal services, that does not mean it did so here.

In any case, Section 82.003 does not allow the Vendors to sell legal services without engaging in the unauthorized practice of law. We have found no Texas cases interpreting this exemption, but the Fifth Circuit has interpreted Section 83.002 to apply to

23

services that "do not require the use of legal skill or knowledge." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 742 (5th Cir. 2003). The court reached this conclusion because the purpose behind Section 83.001 was to "prohibit nonlawyers from exercising legal skill or knowledge in the preparation of legal documents." *Id.* at 742 n.20. We agree with this interpretation. The legislature has defined the practice of law in part as "the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined," Tex. Gov't Code § 81.101(a), and Section 83.001 defines a specific type of unauthorized practice, *see id.* § 83.006 ("A violation of this chapter constitutes the unauthorized practice of law and may be enjoined by a court of competent jurisdiction."). Both contracts are structured to take advantage of Section 83.002 to ensure that neither vendor provides a service that "require[s] the use of legal skill or knowledge." The record supports that BMG intended this result—Black testified that one of BMG's former partners was significantly involved in lobbying the legislature to enact Section 83.002.

Based on the contracts, the surrounding legal context, and the other evidence of record, we conclude that the record conclusively demonstrates that the essence of the transactions at issue was the provision of data-processing services. *See* Tex. Tax Code § 151.0035(a)(1); 34 Tex. Admin. Code § 3.330(a)(1). Consequently, the district court erred by concluding that BMG demonstrated its entitlement to a refund of the taxes paid under protest.

We sustain the Comptroller's final issue.

24

**CONCLUSION**

We reverse the district court's judgment and render judgment that BMG take nothing.  *See* Tex. R. App. P. 43.2(c).

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Reversed and Rendered

Filed:   February 25, 2022